143 N.J. Super. 237 (1976)
362 A.2d 1258
AMERADA HESS CORPORATION, A DELAWARE CORPORATION, PLAINTIFF,
v.
DAVID BARRY QUINN, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 7, 1976.
*241 Mr. Stephen E. Barcan argued the cause for plaintiff. (Messrs. Wilentz, Goldman & Spitzer, attorneys).
Mr. Richard J. Weiner argued the cause for defendant.
DOAN, J.S.C.
At issue in this case is the right of plaintiff, an oil company, to terminate a Dealer Lease (lease) and a Dealer Franchise and Sales Agreement (franchise agreement) for a location known as Hess Station No. 30256 (the station) located at 451 Route 23 in Wayne, New Jersey. The present dealer at the station is defendant David Barry Quinn, who has occupied the station pursuant to those agreements since December 1968. Plaintiff Amerada Hess Corporation (Hess) contends that Quinn had breached the agreements in numerous respects; that these breaches are substantial, both individually and in the aggregate, and that, therefore, Hess properly terminated these agreements and is entitled to possession of the station. Quinn denies the charges, and at the pretrial conference which molded the *242 pleadings in this case Quinn set up the claim to a permanent injunction to prevent plaintiff from effectuating its termination of the agreements.
The genesis of this litigation followed the service upon defendant of the notice of termination dated October 31, 1974. Plaintiff instituted the present action in the Chancery Division seeking damages in the first three counts of the verified complaint and injunctive relief in the fourth count enjoining defendant from altering or destroying any records. Defendant, in its amended answer, set up a counterclaim which sought damages for breach of contract in six counts. By a consent order dated November 4, 1974 each of the parties was enjoined from altering or destroying any records pertaining to the operation of the station until the termination of the litigation, and the case was transferred to the Law Division. Thereafter defendant moved in the Law Division for a preliminary injunction restraining plaintiff from executing its notice of termination and recovering possession of the station until a plenary hearing was held to determine plaintiff's right in regard thereto. After a hearing on that application an order was entered on December 19, 1974 restraining plaintiff from terminating the lease and franchise agreement and removing defendant from the station until the further order of the court. Plaintiff's application for leave to appeal that order was denied by the Appellate Division on January 20, 1975. Thereafter plaintiff moved to vacate the restraint described in the order of December 19, 1974, and on August 28, 1975 plaintiff's motion to dissolve the existing preliminary injunction was denied.
At pretrial conference held on November 21, 1975 the pleadings in this action were molded so that the claims for damages in the first three counts of plaintiff's complaint and the first five counts of defendant's counterclaim were dismissed without prejudice, leaving open defendant's sixth count for leakage loss resulting from a defective storage tank, which count was severed to await disposition following the trial of the present action. Thus, the only issue remaining *243 for present disposition is whether defendant has failed to "substantially perform" its obligations under the lease and franchise agreement so that "good cause" for termination exists. Cf. N.J.S.A. 56:10-5, Shell Oil Co. v. Marinello, 63 N.J. 402 (1973). Plaintiff seeks judgment for possession and defendant seeks a permanent injunction restraining plaintiff from terminating the agreements. The action as thus molded is, in essence, a conventional injunction suit. As such, an order was entered, on December 1, 1975 striking defendant's demand for trial by jury and directing that the action be tried before the court alone.
Since 1960 Hess has marketed gasoline and motor oil through gasoline service stations located on the East and Gulf Coast of the United States. Throughout this period Hess has promoted its products and promoted its trademark, trade name and image through what it describes as a unique marketing policy. It has a little over 100 stations in New Jersey and about 465 in all of the United States. It does not engage in the sale of tires, batteries or automotive accessories, nor does it perform automotive repairs. Rather, its gasoline stations' revenue is derived solely from its sale of petroleum products.
In order to establish and maintain its customer satisfaction and good will, Hess had developed and actively promoted the image of a company which retails its products in modern, clean and brightly lighted service station facilities, staffed by courteous employees who rendered prompt and complete service which includes cleaning front and rear windows, headlights and side view mirror and checking underneath the hood. These concepts are contained in the agreements as well as in the Statement of Marketing Policy which is accepted in writing by its dealers, including Quinn, and prominently displayed in its salesroom. Hess bears the entire investment in a given site involving extensive land and construction costs and the continuing expenses, such as taxes and insurance. Hess charges its dealers no franchise fee. *244 They are required only to furnish a security deposit to cover the last load of gasoline supplied to them.
The terms of the relationship between the parties are embodied in the lease and franchise agreement. Each is dated December 19, 1968. The lease ran until January 31, 1969 and thereafter automatically renews itself from month to month until either party terminates the lease by giving at least 30 days' written notice to the other party before the end of the initial term or before the end of any subsequent monthly term. The franchise and agreement, executed on December 19, 1968, ran for a term to expire January 31, 1970 and has thereafter automatically renewed itself from year to year. Either party has the right to terminate the agreement by giving at least 30 days' written notice to the other party before the end of the initial term or before the end of any subsequent renewal term. It also provided that if the dealer breached any of the provisions of the agreement, plaintiff would have the right to terminate the agreement on 24 hours' written notice to the dealer. Each agreement provided that a breach of one would be a breach of the other.
By letter dated October 31, 1974 plaintiff notified defendant that due to his failure to substantially comply with the terms of the lease and franchise agreement both were terminated effective December 31, 1974. The grounds for termination set out in that letter were:
(1) That defendant sold gasoline at prices which exceeded those allowable by the Economic Stabilization Act of 1970 and the Emergency Petroleum Allocation Act of 1973 in violation of ¶ 5 of the Dealer Lease and ¶ 5 (f) of the Dealer Franchise and Sales Agreement.
(2) Defendant's operation of the station has led to a substantial decline in the volume of gasoline sold from April 1974 and continuing to October 31, 1974.
(3) The 10-car observation surveys taken and defendant's field representative's reports show a complete lack of adherence to the Hess Marketing Policy which defendant agreed to follow on at least the dates in 1974 running sporadically from January 16th to October 21st in violation of ¶ 5 of the Dealer Franchise and Sales Agreement.
*245 (4) That defendant failed to maintain a clean and attractive station in violation of ¶ 5 of the Dealer Franchise and Sales Agreement and ¶ 6 of the Dealer Lease on dates which ran sporadically from January 5, 1974 to October 16, 1974.
(5) That defendant failed to devote his full time and effort to the operation of the station in violation of ¶ 14 of the Dealer Franchise and Sales Agreement on dates in 1974 running sporadically from January 5th to October 16th.
(6) [Added at trial by leave of court] defendant failed to maintain records contrary to the New Jersey Motor Fuel Act, N.J.S.A. 54:39-33 and 34, the New Jersey Motor Fuel Sales Act, N.J.S.A. 56:6-12 and regulations promulgated pursuant to said statutes as contained in N.J.A.C. 18:18-4.1, et seq., (b) (1) and (4); also in violation of Federal Energy Regulation 10 C.F.R. § 212.128 and 212.129, the gist of these statutes and regulations being that defendant was required to maintain a daily sales record which showed the unit price of each product, a monthly expense record which must include all overhead and general business expenses and records of base production control levels and selling prices authorized by the petroleum price rules of the federal regulations.
Although plaintiff relies upon all of the breaches described above, its principal thrust is directed toward defendant's violation of the Economic Stabilization Act of 1970 as amended (P.L. 92-210) in § 203. This act led to the issuance of Executive Orders Nos. 11695, 11723 and 11730, which authorized the Cost of Living Council to issue regulations to carry out the Congressional mandate as necessary to stabilize prices, rents, wages and salaries. The Cost of Living Council issued a regulation contained in 6 C.F.R. 150.359 (applicable to resellers and retainers) which provides in part:
(C) Price rule. (1) A seller may not charge a price for any item subject to this section which exceeds the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned on May 15, 1973, plus an amount which reflects on a dollar-for-dollar basis, increased cost of the item. (2) Notwithstanding subparagraph (1) of this paragraph, with respect to special products: (1) Beginning with January 1, 1974, with respect to retail sales, a seller may charge 1¢ per gallon in excess of the amount otherwise permitted to be charged for that item * * *.
Gasoline is one of the "special products" for which this 1¢ a gallon increase was authorized. This section was amended as *246 of March 1, 1974 to permit an additional 2¢ a gallon increase, for a total permitted increase of 3¢ a gallon.
Throughout the pendency of this litigation defendant steadfastly maintained that he had not violated the provisions of the federal regulations referred to. Although it was alleged by plaintiff throughout that period that defendant's weighted or basic price as of May 15, 1973 was 35.9¢ a gallon for regular gas and 39.9¢ a gallon for premium gas (unit prices), defendant denied this charge factually and asserted continuously that his basic retail selling price as of May 15, 1973 was 37.9¢ a gallon for regular gasoline and 41.9¢ a gallon for premium gasoline, and that based upon these figures he was not in violation of the lawful federal regulations. It was not until the fifth day of this trial, on March 26, 1976, that defendant, through his counsel, admitted in open court that as of May 15, 1973 his basic retail sales price for regular gas was 35.9¢ and for premium gas 39.9¢ a gallon, and not as he had theretofore contended. At the time that this admission was made in open court defendant, through his counsel, also admitted that pursuant to investigative procedures initiated by plaintiff with the Federal Energy Administration, investigation and meetings were held with Quinn and his counsel in attendance; that a remedial order was entered by the Federal Energy Administration dated March 3, 1975 which concluded that a violation of 10 C.F.R., § 212.93 had occurred; that defendant was to reduce his sales price on each grade of gasoline to the maximum allowable ceiling price for each. The base prices were to be 35.9¢ a gallon for regular and 39.9¢ for premium. The remedial order further provided that defendant was to reduce the sales price on each grade of gasoline 2¢ below the maximum ceiling price or the sales price as of February 15, 1975 (whichever is lower) for a total of 2,298,928 gallons in order to refund the total overcharge of $45,978.43 to the public. Thereafter, and on appeal, a decision and order was entered on May 12, 1975 by the Federal Energy Administration, Region II, which denied *247 defendant's appeal in all respects and stated that the order was a final order from which defendant might seek judicial review. No judicial review was sought. At the trial in this cause the figures found by the Federal Energy Administration were by consent amended to show the amount of overcharge to be $45,507.46 on 2,534,811 gallons.
The court is convinced from the preponderance of the voluminous proofs presented to it that the overcharge was willful and not the result of a computation error made during a good faith effort to comply with the federal dictates.
Defendant had claimed that he computed his base price from his May monthly sales summary through a trial-and-error approach of seeing which unit prices when multiplied by the number of gallons of the two grades produced the total retail sales figure recorded for that day, or the sum closest to it. By this method, it was stated, Quinn determined May 15, 1973 unit prices of 37.9¢ for regular and 41.9¢ for premium, results which are not concededly wrong.
Leaving aside the questions of possible deliberate alteration of the summary sheets so as to result in the computations leading to the greater unit prices (evidence of which was not offered as a result of defendant's admission of the overcharge) and the destruction of "shift sheets" by Quinn, thereby forcing him to the less detailed monthly summary for his calculations, the testimony of Lawrence Jackson, Quinn's immediate supervisor in the Hess chain of command, indicated that he discussed the federal regulations personally with Quinn on December 19, 1973, at which time he told defendant that he felt his prices were too high. Prior thereto he'd reviewed the new regulations with Quinn by phone on November 12, 1973 and December 11, 1973. Quinn, according to Jackson, replied that his base price was 2¢ higher than other dealers and that he felt entitled to a large profit since Hess profits had risen markedly during a period when his margin had not increased. Jackson further testified that in late February or early March 1974 he discussed the regulations and pricing with defendant while apprising him of the termination of *248 another dealer for overpricing. Again Quinn stated that his base prices permitted the unit prices he was then charging. Jackson's testimony reveals that defendant's general attitude during this period was one of disdain for the managerial personnel of Hess, indifference to Hess' marketing policy and Hess' interest in his operations, and prime concern for his economic advancement. Defendant did not take the stand to deny these meetings. Jackson's testimony is supplemented by that of Wayne Moody, Hess Gas Stations Operations Manager, who stated that he felt defendant was overpricing in late November or December 1973 and instructed Jackson, as Quinn's dealer representative, to discuss the matter with defendant.
Thus, while no written communication from plaintiff regarding the new federal regulations and possible overcharges thereunder appears to have been issued to its dealers, Quinn was made aware of a believed violation of the federal law on his part. By his own admission, during depositions read at trial, he was aware of the federal requirements. No effort, however, was made by him to check the accuracy of his base unit prices, claimed to be computed in a manner plainly susceptible to error. No attempt was made to elicit any assistance from Hess in verifying his base prices, though he must have been aware that May 1973 credit card purchase records existed which might aid him in determining what his May 15, 1973 unit prices were  records which, if consulted, would have compelled him to the conclusion reached by him during the course of the trial. Nor was any other attempt shown to check on the accuracy of his purported computations. Such inaction is inconsistent with a good faith attempt to comply, in view of the gas shortage at that time and the seriousness of the warned-of violation.
Further, in spite of claims made by plaintiff in this case, and testimony by Moody, that defendant overcharged willfully and deliberately, he failed to testify in his own behalf. It is fundamental that the court, as a factfinder, might consider this failure as permitting an adverse inference *249 to be drawn. In Duratron Corp. v. Republic Stuyvesant Corp., 95 N.J. Super. 527 (App. Div. 1967), certif. den. 50 N.J. 404 (1967), the court said:
The rule permitting adverse inferences from the failure of a party in a civil cause to testify as to matters in issue within his personal knowledge is commonplace and elementary in our jurisprudence. [at 532]
Failure of defendant to testify under the circumstances here necessarily leads to the inevitable conclusion and inference that were he to testify he could not deny that he knowingly and willfully overcharged at a time when our State was in the midst of a crisis due to a shortage of gasoline.
True, no direct evidence regarding Quinn's state of mind with respect to the overcharge exists. However, it has been recognized that one's state of mind is seldom capable of direct proof and ordinarily must be inferred from the circumstances properly presented and capable of being considered by the court. Mayflower Industries v. Thor Corp., 15 N.J. Super. 139, 162 (Ch. 1951), aff'd o.b. 9 N.J. 605 (1952); State Highway Dept. v. Civil Service Comm'n, 35 N.J. 320, 327 (1961); Cozad v. Strack, 254 Iowa 734, 119 N.W.2d 266, 270 (Sup. Ct. 1963); Majestic Securities Corp. v. Comm'r of Internal Rev., 120 F. 2d 12, 14 (8 Cir.1941); Herrman v. Daffin, 302 S.W.2d 313, 316 (Mo. App. 1957). Where resort is necessary to such proofs the standard is whether there is "evidence in quality sufficient to generate belief that the tendered hypothesis is in all human likelihood the fact." Ciuba v. Irvington Varnish & Insulator Co., 27 N.J. 127, 139 (1958). The court there went on to note:
Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as a "mere preponderance of probabilities, and, therefore a sufficient basis for decision" * * *. It need not have the attribute of certainty, but it must be a presumption well founded in reason and logic; mere guess and conjecture is not a substitute for legal proof. The determinative inquiry is whether the evidence demonstrates the offered hypothesis as a rational inference, that is to say, a presumption grounded in the *250 preponderance of probabilities according to the common experience of mankind * * *. The evidence must be such as to lead a reasonably cautious mind to the given conclusion. [at 139-140]
The most reasoned conclusion to be drawn from the proof presented here is that defendant knowingly and willfully charged 2¢ a gallon above the ceiling price permitted by law, and the court so finds.
The initial question to be considered, then, is whether this willful overcharge by defendant is itself sufficient to justify termination of the lease and franchise agreement under our law, those contracts expressly requiring the defendant to comply with all laws, ordinances or regulations covering his operation and use of the station [¶ 5 of the lease] and forbidding the conducting of illegal activity there [¶ 5(f) of the franchise agreement].
In New Jersey a franchise relationship may only be terminated upon a finding of "good cause" which, in turn, means finding that the franchisee has failed to substantially perform his obligations under the franchise compact, here consisting of the "Dealer Lease" and "Dealer Franchise Agreements."
The Franchise Practices Act, N.J.S.A. 56:10-5, provides:
It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, cancelling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise. [Emphasis supplied]
Further, and independent of the Franchise Practices Act, our highest court, in Shell Oil Co. v. Marinello, 63 N.J. 402, (1973), cert. den. 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475, dealing with a lease antedating the effective date of the statute and thus "not directly controlled by it," stated the following:
*251 We hold (1) that the lease and dealer agreement herein are integral parts of a single business relationship, basically that of a franchise, (2) that the provision giving Shell the absolute right to terminate on 10 days notice is void as against the public policy of this State, (3) that said public policy requires that there be read into the existing lease and dealer agreement, and all future lease and dealer agreements which may be negotiated in good faith between the parties, the restriction that Shell not have the unilateral right to terminate, cancel or fail to renew the franchise, including the lease, in absence of a showing that Marinello has failed to substantially perform his obligations under the lease and dealer agreement, i.e., for good cause, * * *. [at 410-411]
The underlying aim of the Franchise Practices Act and Marinello, supra, is to protect the franchisee from undue usurpation of his franchise while yet allowing franchisor to protect its trade name, trademark and good will interests in the franchise arrangement. With that in mind, the substantiality of a franchisee's noncompliance, as a legal concept, must be gauged in light of its effect upon or potential to affect the franchisor's trade name, trademark, good will and image which, after all, is the heart and substance of the franchising method of doing business. The public could hardly escape awareness of a substantial increase with consequent unwarranted adverse stress on the Hess trademark. That Hess must constantly police its franchise structure in order to protect its good will and image for the benefit of all is made plain from the evidence. Defendant's overcharge might be but an isolated instance. However, the welfare of the franchise structure requires that Hess take such action, the minor effect of which is to terminate plaintiff, but the major effect of which is to protect and preserve the good will and image shared by itself and all of its franchisees. In this context defendant's failure to observe and comply with all laws, ordinances and regulations covering his business amounted to a substantial dereliction having an adverse impact upon Hess' trade name, trademark and good will. Hence, good cause for termination is manifest.
Defendant contends that the extent of the overcharge might escape attention or cause only slight upset and, *252 therefore, is insubstantial in the actual or potential impact of the franchisee's derelictions upon the franchisor's "trade name, trademark, good will and image, thus precluding a since no notoriety arose out of the Federal Energy Administration investigation into his overcharge and there were no complaints from the public regarding his prices at any time nor any newspaper publicity associated with the same, his willful overcharge had no or little effect upon Hess' trade name, trademark, good will and image, thus precluding a finding of substantial noncompliance allowing termination. Reason and common sense require rejection of this contention. A franchisor, such as Hess here, has interest in a particular franchisee's performance broader than the mere protection and enhancement of its trade name, trademark and the good will attached thereto, though these are, of course, important. The franchisor also has an interest in the marketing of its products, here gasoline and motor oil, through the franchise, and a franchisee's breach of his reasonable obligations thereunder, proved to have adversely impacted the volume of the franchisor's goods sold through the franchisee, would substantially impair that interest so as to justify termination. But more basic than this, it is the opinion of the court that a franchisee who has willfully violated the statutes and regulations governing the operation of his business contra the terms of the franchise agreement, has failed to substantially perform his franchise obligations within the intendment of the Franchise Practices Act, N.J.S.A. 56:10-5 and Marinello, supra.
The concept of substantial performance is an equitable one generally utilized in the realm of building contracts but applied, where appropriate, to other contractual agreements as well. It allows one who has performed in good faith, though making some slight omissions or deviations from the letter of the contract or its specifications, so as to provide the other party substantially what he bargained for, to recover the contract price less a sum sufficient to compensate the other party for or cover correction of the defective aspects *253 of his performance. 6 Williston on Contracts (3d ed.), § 842 at 169, Damato v. Leone Const. Co., 41 N.J. Super. 366, 371-372 (App. Div. 1956), Jardine Estates v. Donna Brook Corp., 42 N.J. Super. 332, 337-338 (App. Div. 1956). It rests on principles of fairness well expressed by the court in Mort Co. v. Paul, 167 Pa. Super. 532, 76 A.2d 445, 447 (Super. Ct. 1950), quoting from Gillespie Tool Co. v. Wilson, 123 Pa. 19, 26, 16 A. 36, 37 (Sup. Ct. 1888):
The equitable doctrine of substantial performance is intended for the protection and relief of those who have faithfully and honestly endeavored to perform their contracts in all material and substantive particulars, so that their right to compensation may not be forfeited by reason of mere technical or unimportant omissions or defects.
It is this principle that has been carried into the franchise milieu by the "good cause" requirement for termination. The franchisor's superior bargaining position in the relationship was recognized, along with the inevitable intertwining of the franchisee's livelihood with the franchise, at least for one who has expended time, effort and often money in its prospering. The inequity of allowing the franchisor to terminate the relationship, pursuant to contractual clauses drafted by it, meaning less to the franchisee and the inclusion of which the franchisee was powerless to prevent, where the franchisee had sought to and substantially did meet his duties under the agreement to the benefit of the franchisor, was patent. It was this situation that was addressed by the Legislature and our Supreme Court in Marinello. Thus, the statement appended to the Assembly Bill No. 2063, stated that the law would:
* * * rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and nondiscriminatory standards. The bill would protect the substantial investment  tangible and intangible  of both parties in the various franchises. It would rule out economic coercion as a business tactic in this most sensitive field. [Emphasis supplied]
In Marinello it was noted:
*254 However, the Act reflects the legislative concern over long-standing abuses in the franchise relationship, particularly provisions giving the franchisor the right to terminate, cancel or fail to renew the franchise. To that extent the provisions of the Act merely put into statutory form the extant public policy of this state. [63 N.J. at 409]
See also, Judge Gelman's review in the lower court opinion in Marinello, 120 N.J. Super. 357 at 371-374.
The evident purpose of the statutory and common law termination requirements, then, is the protection of franchisees who have conscientiously striven to carry out their obligations under the franchise agreement. They were not intended to prevent the severance of those who deliberately disregard reasonable requirements contained in their contract with the franchisor. Certainly, they were not designed to shield those who willfully violate the laws regulating their business, in contravention of the franchise terms. No reason, grounded in logic, fairness or public policy, presents itself for denying the franchisor the right to terminate the franchise under circumstances such as found here. Rather, protection of the public's welfare points toward termination of dishonest franchisees. To deny Hess the right to terminate here would be to put the stamp of approval upon the deliberate illegal behavior of defendant, pervert the spirit of the "good cause" requirement, and allow defendant to flagrantly flaunt his disregard for the law, his private contracts and the public interest. Such an absurd result cannot be deemed to have been contemplated or intended by the Legislature. Schierstead v. Brigantine, 29 N.J. 220, 230 (1959); Smith v. Bergen Cty. Bd. of Chosen Freeholders, 139 N.J. Super. 229, 237 (Law Div. 1976); In re Summit and Elizabeth Trust Co., 111 N.J. Super. 154, 168-169 (App. Div. 1970).
The court therefore finds that defendant's deliberate violation of the federal pricing regulations, contra the mandates of the Dealer Lease and Dealer Franchise Agreement, constitutes, as a matter of law, substantial noncompliance *255 with his obligations under the franchise so as to allow termination thereof.
Assuming the foregoing, defendant urges that plaintiff should be estopped from relying upon this violation because it knew of defendant's dereliction in early 1973 and did not notify defendant thereof or take any steps to arrest the improper overcharges. As noted earlier, the evidence shows that Quinn was, in fact, aware of the belief on Hess' part that he was overcharging. Regarding the purported failure of plaintiff to continue pursuing the matter with defendant, Moody testified that the Federal Energy Administration was notified of the possible transgression in April or May 1974 and a representative of that agency interviewed defendant in June, at which time defendant maintained his innocence. Moody stated that plaintiff felt it was best then to await the result of the FEA action to see if their suspicions were confirmed.
The defense of estoppel sometimes referred to by defendant as "condonation" has no factual or legal support in the evidence.
Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy. [Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449]
The violation of the federal regulations in breach of defendant's contracts with plaintiff were voluntary acts on his part, not on the part of plaintiff. Nowhere in the evidence is there any testimony to support the claim that plaintiff did or said anything to defendant with reference to that violation of the federal law. There was no conduct of plaintiff, either active or passive, upon which defendant could in good faith rely. Defendant relied only on his own desire to wrongfully *256 line his own pocket at the expense of the public, and in the process he endangered the good name, economic benefit and image of the plaintiff.
The reference by defendant to "condonation" as a defense against plaintiff's claim is inappropriate. This defense at one time was a ground to bar relief in matrimonial actions where sexual relations took place after a cause of action for divorce had already accrued. This defense is no longer viable even in matrimonial actions. N.J.S.A. 2A:34-7.
Furthermore, as observed earlier, the interest of a franchisor in the franchise relationship goes beyond the bounds of disparagement of its trade name, trademark, good will and image. By this mechanism he markets his products to the consuming public, and the ultimate end sought by him in entering into the franchise relationship is the maximum sale possible of those goods. The obligations imposed upon the franchisee are framed in line with the franchisor's conception of what steps will most effectively market that product vis-a-vis his competitors. The Hess marketing policy incorporated into the obligations of providing clean, fast, courteous and thorough service, contained in the Dealer Franchise Agreement, evidence this fundamental interest of plaintiff in the franchise before the court. Plainly, noncompliance by a franchisee with his reasonable franchise obligations, resulting in an actual or potential adverse effect upon the sales of the franchisor's products, would constitute substantial noncompliance thereof for purposes of termination, impairing as it does the franchisor's fundamental reason for initially entering into the relationship.
The testimony of plaintiff's expert, Dr. Marcus, evidenced that the gasoline industry is a highly competitive one primarily because of the product's substitutability, the high number of retail outlets available to the consumer and the rapid circulation of price information among consumers. He stated that Hess' marketing policy was aimed at attracting that segment of the market that buys primarily by price (Hess *257 not offering the repair and accessory services commonly associated with filling stations) and that it was fundamental to plaintiff's success that its outlets attract repeat business, i.e., customers who return because of the price and service. He indicated that any violation of the Hess marketing policy by a dealer would result in some customers not returning, thus harming Hess, but that the major factor was price. While consumer sensitivity to price is hard to measure, Dr. Marcus' testimony indicated that any increase over the competition would lead to some loss of business and that the higher the increase the greater the loss. Customers would not necessarily complain: they would simply go elsewhere. The price factor impact upon Hess would be even greater in view of the absence of other services and would be aggravated further should service aspects of the Hess marketing policy be not complied with. He opined that a 2¢ overcharge would have some damaging effect.
A "Report of Gasoline Deliveries," summarizing gallonage drops from 1971 to February 1976, thereby reflecting the gallonage being pumped by Quinn, was introduced. This showed that during the midst of the gasoline shortage, when any available supply was being consumed, defendant's business sold in the range of 275,000 to 310,000 gallons a month. As the crisis eased in the Spring, the gallonage sold commenced dropping until it reached a nadir of 74,000 gallons in September 1974. Quinn lowered his price some 7¢ a gallon in October 1974, according to Charles Hereford, Quinn's field representative at the time, as a result of his obtaining T.V.A. (essentially a reduction in the stated tank wagon price to assist his competitive position) and taking a reduction in his own margin. In November Quinn's gallonage jumped to 178,000 gallons (from 81,000 in October).
Undoubtedly, a portion of Quinn's volume decline is attributable to increases in the price he paid to Hess, thereby eroding his competitive position. However, it cannot be gainsaid that the additional 2¢ overcharge had no impact on the decline. By charging this illegal excess, defendant thereby *258 aggravated his worsening competitive posture, thereby likely losing customers who might have patronized him were the differences between him and the stations around him narrower. Further, in light of Hess' dependence upon the price factor, the potential for damage to sales of Hess gasoline from illegally charging an extra is obvious. The court finds that the preponderance of the evidence supports the conclusion that Quinn's violation of the federal regulations impaired Hess' franchisal interest in the sale of its gasoline and motor oil products. Thus, defendant's violation of the federal pricing regulations, willful or not, constituted a substantial noncompliance of his obligations under his franchise arrangement with Hess.
The foregoing is dispositive of the case. However, in view of the large amount of time spent on the issue of cleanliness and defendant's alleged violations of the Hess marketing policy, some comment thereon seems required. There is no need to summarize the abundant proofs in this area. Suffice it to say that the court is convinced that defendant did in fact fall far below his obligations in this area. This violation, while standing alone, might not rise to the level of nonperformance justifying termination, particularly in view of the state-wide failure in this regard, it further supports, when combined with the previously noted factors, a conclusion that "good cause" exists under the law justifying plaintiff's termination of defendant.
The restraints imposed by the court on December 19, 1974 are vacated and judgment for possession entered in favor of plaintiff. Defendant shall vacate the station no later than 30 days next following the date of the order for judgment.