**Robert K. SCHULTZE and Edith Georgianna Schultze, his wife, Appellants,**

v.

**CHEVRON OIL CO., a California Corporation.**

No. 77–1152.

United States Court of Appeals, Third Circuit.

Argued April 24, 1978.

Decided June 12, 1978.

Miller & Lookhoff, East Brunswick, N. J., for appellants; Conboy, Hewitt, O'Brien & Boardman, Myron D. Cohen and David R. Davies, New York City, Irving G. Schleimer, Robert S. Miller and Harmon H. Lookhoff, East Brunswick, N. J., on the brief.

Wilentz, Goldman & Spitzer, Woodbridge, N. J., for appellee; Francis X. Journick, Woodbridge, N. J., of counsel, Marvin J. Brauth, Woodbridge, N. J., on the brief.

Before ALDISERT and ADAMS, Circuit Judges, and HANNUM, District Judge.*

* Honorable John B. Hannum, of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major questions presented in this appeal by plaintiffs from a directed verdict in favor of the defendant in a diversity case require us to decide whether the district court erred in determinations relating to a right of first refusal clause in a lease between appellants, Robert and Edith Schultze, owners of a service station, and Chevron Oil Co. Appellants contend here, as they did in the district court that Chevron, in refusing either to exercise or waive its right of first refusal, tortiously interfered with their attempts to sell the premises. They also argue that New Jersey law implies a covenant of fair dealing into every contract, and that Chevron violated its duty to deal in good faith. We believe that the district court properly directed a verdict in Chevron's favor and, accordingly, affirm.[1]

### I.

The record discloses the following facts, none of which is seriously in dispute. Robert and Edith Schultze owned real estate on which a service station was erected. In 1963, they entered into a commercial arrangement with Morris Oil Company, Inc., containing these material terms: the Schultzes leased the property to Morris; Morris sublet the station back to the Schultzes; the Schultzes operated the station, purchasing supplies and inventory from Morris; and Morris was granted a "prior right to purchase" in the event the Schultzes received an offer to purchase during the 15-year term of their lease. On June 30, 1968, Morris assigned to the appellee, Chevron, all Morris' rights and duties under the agreement, including the prior right to purchase.

In late 1970, when the Schultzes decided to sell their business, Robert Schultze inquired of a Chevron sales representative whether Chevron would be interested in

1. Our disposition precludes consideration of the appellants' additional contention that compensatory and exemplary damages are appropriate.

purchasing the station. After consulting with corporate officials, the sales representative informed Schultze that Chevron had no interest in making the purchase.

Schultze then advertised the property for sale and listed it with real estate brokers. As a result, several prospective buyers expressed interest in the property. Chevron's right of first refusal apparently impeded negotiations with the interested parties. Schultze therefore sought Chevron's written waiver of its right of first refusal; Chevron did not execute a written waiver, but in February 1972, after informing Schultze again that it would not buy the station, suggested the alternative of drafting a new long-term lease. Negotiations between Schultze and Chevron continued for six months before Chevron decided not to enter a new lease but to waive, in writing, its right of first refusal.

After receiving the waiver, the Schultzes sold the station for $85,000. They brought this action to recover the difference between the sale price and the highest "offer" received before Chevron's waiver of its prior right to purchase; to recover damages for injuries to their health, for pain and suffering and for mental anguish caused by Chevron's acts; and to collect exemplary damages for Chevron's actions.

In orally granting Chevron's motion for a directed verdict, the district judge concluded that Chevron had no obligation to waive its right of first refusal where the Schultzes failed to submit a written bona fide offer; that there was no evidence suggesting a reasonable probability that the Schultzes would have sold their station to a third party if Chevron had waived its right; and that, even if Chevron did impair the Schultzes' ability to obtain firm offers, there was no evidence upon which the jury could have awarded damages. The parties agree that the law of New Jersey controls this diversity case.

## II.

Chevron's prior right to purchase, contained in Clause 11 of the parties' lease, provides in pertinent part:

If Lessors receive from a third party an acceptable bona fide offer to buy such property, Lessors shall forthwith give Lessee written notice thereof together with a copy of such offer. Lessee or its nominee shall have 30 days from the receipt of such notice and offer to buy such property at the terms of such offer relating to such property. If Lessee or its nominee fails to exercise this option, Lessors may, within 90 days after receipt of such written notice by Lessee, sell such property but only for a price and upon terms of payment and upon other terms which are identical to those set forth in the notice to Lessee.

### A.

■ The primary requirements of this provision are unambiguous. In order to create any duty on Chevron's part, two conditions must have been met. The Schultzes must have received "an acceptable bona fide offer", and the offer must have been communicated to Chevron in writing. Neither condition was met.

Because there was no evidence that any of the parties interested in purchasing the property ever made an offer of sufficient specificity to fulfill the bona fide offer requirement, the district judge did not err in deciding as a matter of law that no bona fide offer was received by the Schultzes. More important, even if evidence had existed on this question which would have implicated the fact-finding role of the jury, the jury's consideration of the question was foreclosed by the fact that no written notice of such an offer was given to Chevron. We fail to see how a "copy" of an oral offer can be submitted in writing.

### B.

■ Apparently recognizing that the express terms of the quoted provision were unfulfilled by them, appellants argue that, in any event, Chevron violated its duty of fair dealing by not executing a written waiver of its prior right to purchase. They correctly state that New Jersey courts recognize the principle that

[i]n every contract there is an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing." 5 Williston on Contracts § 670, pp. 159–160 (3d ed. 1961).

*Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522, 531 (1965); *Association Group Life, Inc. v. Catholic War Veterans*, 61 N.J. 150, 153, 293 A.2d 382, 384 (1972); *Bak-A-Lum Corp. of America v. Alcoa Building Products, Inc.*, 69 N.J. 123, 129–30, 351 A.2d 349, 352 (1976). Such a broad principle, however, is of little assistance in the present factual situation.

Appellants rely primarily on *Fitt v. Schneidewind Realty Corp.*, 81 N.J.Super. 497, 196 A.2d 26 (1963), the leading case on unlawful interference with prospective economic advantage. There, the Superior Court of New Jersey stated:

> In order for the plaintiff to prevail in an action such as this, the court must find from the evidence that but for defendants' wrongful acts it is reasonably probable that plaintiff would have effected the sale of the property . . . . A wrongful act is one which in the ordinary course of events will infringe upon the rights of another to his damage, or one which is done with the purpose of benefiting the acting party at the other's expense and is not done in the exercise of an equal or superior right.

*Id.* at 504, 196 A.2d at 30.

■ The Schultzes failed to sustain their dual burden of establishing both a wrongful act, an act "not done in the exercise of an equal or superior right", and a reasonable probability of effecting a sale. The record establishes that Chevron merely awaited written notice of an acceptable bona fide offer. An implied covenant of fair dealing does not vitiate Chevron's contractual right to such notice, and we consider that right to be at least equal to any alleged "right" in the Schultzes to demand

a waiver. Nor can we say that the record establishes a reasonable probability of a sale but for Chevron's acts. "Feelers", or mere expressions of interest in the property are insufficient to support the requirement of reasonable probability. We think a bona fide offer would be necessary to establish anything more than a possibility.

Appellants also rely on *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), a case which is superficially related to the facts before us. *Shell* involved a lease and dealership agreement between a major oil company and a service station operator who sought to avoid enforcement of one of the terms of the lease. The lease could be terminated by Shell upon 30 days' notice, and the dealership agreement upon 10 days' notice. Shell gave the dealer six weeks' notice of termination of both the lease and the dealership agreements, without stating any reasons for its action. The dealer was granted equitable relief upon the trial court's holding that "there was an implied covenant in said lease and agreement on the part of Shell not to terminate the relationship without good cause, and these instruments must be reformed to include such covenant; . . ." *Id.* at 406, 307 A.2d at 600. Citing "the public policy of this State affecting such [a] relationship," the Supreme Court of New Jersey indicated

> full agreement with the basic determination of the trial court that Shell had no legal right to terminate its relationship with Marinello except for good cause, *i. e.*, the failure of Marinello to substantially comply with his obligations under the lease and dealer agreement.

*Id.*

Facts deemed significant by the *Shell* court in reaching its decision included the gross disparity in bargaining power between Shell and Marinello, resulting in Shell's ability to dictate the terms of the agreements; the grossly unfair contractual provisions at issue; and the clear tendency to injure the public. The absence of these factors clearly distinguishes *Shell* from the case before us. First, the record does not substantiate disparity in bargaining power

between the Schultzes and Morris, the original parties to the lease. Even assuming the superior resources of an oil company vis-à-vis a typical dealer, we are not apprised of appellants' position as owner-dealers vis-à-vis the typical dealer-franchisee. Second, we see no reason to compare a unilateral right to terminate a dealership with a right of first refusal. The New Jersey court characterized the former as "grossly unfair", noting that the dealer has "everything to lose". *Id.* at 409, 307 A.2d at 602. In contrast, a lessee's right of first refusal is a means of protecting him without placing a burden on the lessor; it has the effect of creating two prospective purchasers for every offer received by the owner. Finally, we see nothing inherent in the lease provision which clearly tends to the injury of the public in any way comparable to the provision in the *Shell* agreement.

■ In short, we do not believe that the Supreme Court of New Jersey would declare Chevron's prior right to purchase "void as against the public policy of [New Jersey]", *id.* at 410, 307 A.2d at 603, as it did the termination provision in *Shell*.

### III.

Having accepted the validity of the lease provision granting a prior right to purchase, we think that on any theory of liability, a prerequisite to recovery is a showing that appellants received a bona fide offer. We have examined record evidence of the "offers" received by Schultze and conclude that the district judge correctly held as a matter of law that none constituted a bona fide offer. Accordingly, the judgment of the district court will be affirmed.

ADAMS, Circuit Judge, dissenting.

In recent years, the courts of New Jersey have adopted the principle that a covenant of good faith and fair dealing is to be implied in contracts governed by the law of that state. Consequently, our task in the present case, at least it seems to me, is to determine whether a jury could find such covenant to have been breached by the refusal of a major oil company to waive its preemptive right to purchase the station of one of its dealers, when the dealer is forced to sell his business for reasons of health and when the company has no intention of buying the property. Since, unlike the majority, I do not believe that on the evidence before us a New Jersey court would preclude such a verdict as a matter of law, I must respectfully dissent.

### A.

From 1963 to 1973, the plaintiffs, Robert and Edith Georgianna Schultze, were the owners and operators of a gasoline station located in the Borough of Mountain Lakes, New Jersey. Initially, the station was financed by a loan guaranteed by Morris Oil Co., and in association with that financing, Morris Oil and the Schultzes entered into a lease and then a lease-back arrangement. The Schultzes leased the property upon which their station stood to Morris Oil for fifteen years, terminable by Morris Oil at will, and with provision for renewal at the option of Morris Oil. Morris Oil in turn sublet the same property to the Schultzes with the proviso that the Schultzes sell gasoline distributed by Morris Oil.

Contained in the lease from the Schultzes to Morris Oil was the "first refusal" provision at issue here, which conditioned the Schultzes' power to sell the gasoline station upon their first submitting any bona fide offer to purchase to the oil company, and permitting the oil company to buy the property based on the terms of such offer.[1]

1. The clause reads:
   Lessee, as long as this lease or any renewal hereof is in effect, shall have the prior right, to be exercised by it or by its nominee, to buy the whole or any part of the leased premises or any larger parcel of which the leased premises are a part. If Lessors receive from a third party an acceptable bona fide offer to

buy such property, Lessors shall forthwith give Lessee written notice thereof together with a copy of such offer. Lessee or its nominee shall have thirty (30) days from the receipt of such notice and offer to buy such property at the terms of such offer relating to such property. If Lessee or its nominee fails to exercise this option, Lessors may, within

In June 1968, Morris Oil conveyed its interests in the lease and sublease, along with its other assets, to Chevron Oil Company. Two years later, during the fall of 1970, the Schultzes' family physician informed them that the demands of health required Mrs. Schultze and one of their daughters to move to a warmer climate. Faced with this warning, the Schultzes offered to sell the business to Chevron so that they could relocate in Florida.[2]

Chevron declined this offer in the fall of 1970,[3] and the Schultzes thereupon requested a waiver of Chevron's right of first refusal so that they might proceed with plans to sell the station and move south. Such a waiver was not forthcoming until two years later, in September 1972. In the interim, according to the Schultzes, Chevron's right of first refusal had deterred at least three purchasers, who had contemplated offers of between $120,000 and $168,000, from bidding on the service station, and the Schultzes had been forced to move to Florida before any sale could be consummated.

In late 1972, the Schultzes' station, which then was being operated by an employee, and which had been valued by Chevron's appraiser at $148,000, was sold for $85,000.

The Schultzes brought an action against Chevron for the difference between the amount of the offers which they claim were deterred by Chevron's conduct and the actual sum realized on the sale. Their claim was that by delaying two years in waiving a right which it did not intend to exercise, Chevron breached an implied covenant of good faith and fair dealing of the lease agreement, and that as a result of that breach they had been deprived of the full worth of their property. The Schultzes also claim recovery for tortious interference with business opportunities.

While the majority appears to view the tort and contract actions as inextricably intertwined, I believe the issues raised by each claim are analytically distinct. However, in light of my conclusion that the case should have gone to the jury on the alleged breach of the covenant of good faith, I do not reach the tortious interference claim.[4]

At the close of evidence by both the plaintiffs and the defendant, the trial judge refused to send the case to the jury, and instead granted a directed verdict for the defendant. The appeal from that directed verdict is now before us.

**B.**

Traditionally, at common law the courts do not recognize a general duty of "good faith" between contractual partners.[5] In

---

ninety (90) days after receipt of such written notice by Lessee, sell such property but only for a price and upon terms of payment and upon other terms which are identical to those set forth in the notice of Lessee. In the event of such sale to a third party, such sale shall be made subject to the terms and provisions of this lease, including, but without limiting the generality of the foregoing, the provisions of this section. Lessee agrees to notify Lessors in writing of any nominee designated for the purpose of this section and warrants that such nominee will be financially responsible. Lessors agree to recognize and accept any such designation of nominee for the purpose of this section.

2. Since this case is before us on a dismissal after the close of plaintiffs' and defendant's case, we must, of course, determine whether a jury could reasonably find relief warranted, given every favorable inference to the plaintiffs. *See Patzig v. O'Neill*, 577 F.2d 841, pp. 844–845, typescript pp. 4–5 (3d Cir. 1978); *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir.

1969). From the evidence presented a jury could find that in the course of their offer, the Schultzes conveyed to Chevron the reason for their decision to abandon their business.

3. N.T. 2.95–2.96.

4. *Cf. Associated Group Life, Inc. v. Catholic War Veterans*, 61 N.J. 150, 293 A.2d 382 (1972) (same actions gave rise to claim for breach of good faith covenant and tortious interference with economic advantage). If Chevron's actions breached the implied covenant of good faith and fair dealing, recovery may also be available on a tort theory. However, if Chevron's actions were taken in good faith, it would appear that the majority's conclusion is correct, and no recovery is available, since there has been no violation of duty.

5. *See e. g. Kessler & Gilmore Contracts, Cases & Materials*, 912–13 (2d ed. 1970), Powell, *Good Faith in Contracts* 9 Current Legal Problems 16, 25 (1956). *But cf.* Farnsworth, *Good*

classical theory, at least, the contract created its own world: the obligations of the parties arose exclusively out of the freely-bargained assent of both parties as memorialized in the explicit terms of the agreement.[6] Private assent not public law was to structure private relations, and courts were to have no power to alter what parties had written or contracted. In practice, however, limitation to the letter of the contract expressing the intention of the parties as the sole determinant of the contractual relationship was admixed with a concern for substantive justice. Slowly, sharply-pointed contractual powers became hedged about by equitable duties and implied contractual terms.[7]

Thus during the last generation, the courts of New Jersey have engaged in the explicit "development of those principles of equity, fair dealing, and good faith . . which breathed new life-giving honesty into the bare contractual relationship."[8] In a number of cases, the naked terms of a contract, however explicit, were held not to constitute the final balance of decision. New Jersey Courts instead judged contractual provisions against the demands of fair dealing and public policy. As a result, they disregarded contractual terms exculpating manufacturers from liability for the defects of their products[9] and terms severing a real estate agent's commission from the necessity for ultimate purchase by a prospect whom the agent obtained.[10] Moreover, the New Jersey judiciary has implied terms into contracts where fair dealing so required. Courts have deduced from the right of first refusal a covenant by the grantor not to burden his ability to sell the property to which the right pertains,[11] and have read a warrant of habitability into residential leases.[12]

More generally, a solid line of New Jersey cases has created an obligation of good faith and fair dealing from provisions giving insurance companies the right to try and settle cases against their insureds.[13] These authorities hold insurance companies liable to policy holders for the companies' unfair refusals to settle claims against the insureds which exceed policy limits. Indeed, in *Fireman's Fund Insurance Co. v.*

Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code, 30 U.Chi.L.Rev. 666, 670 (1963) (law merchant absorbed ecclesiastical concern with commercial morality).

6. See Kessler & Fine, *Culpa In Contrahendo, Bargaining in Good Faith and Freedom of Contract: A Comparative Study,* 77 Harv. 401, 409 (1964).

7. Thus, for instance, a promisee is under an implicit duty not to interfere with the performance of the promissor 3 *Corbin on Contracts* § 571 (1960) and in order to be entitled to full contract damages, a plaintiff must have complied with the judicially constructed duty to mitigate his injuries. See Kessler & Gilmore, *supra* note 5 at 976–989. In a more specialized context, a requirement of an architect's certificate is generally understood to be eliminated if the refusal of the certificate is not "in good faith." *Corbin, supra* § 651.

The process of leavening contractual rights with equitable duties reached a new plateau with the Uniform Commercial Code's enactment of various provisions effecting a duty of commercial reasonableness and its general requirement of good faith. See *Farnsworth, supra* note 5; Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the*

*Uniform Commercial Code*, 54 Va.L.Rev. 195 (1968).

8. *Rova Farms Resort, Inc. v. Investors Insurance Co.*, 65 N.J. 474, 323 A.2d 495, 504 (1974).

9. *Henningsen v. Bloomfield Mtrs., Inc.*, 32 N.J. 358, 161 A.2d 69 (1960).

10. *Ellsworth Dobbs, Inc. v. Johnson*, 50 N.J. 528, 236 A.2d 843 (1967).

11. *Wellmore Builders, Inc. v. Wannier*, 49 N.J. Super. 456, 140 A.2d 422 (App.Div.1958).

12. *Marini v. Ireland*, 56 N.J. 130, 265 A.2d 526 (1970).

13. *Radio Taxi Service, Inc. v. Lincoln Mutual Ins. Co.*, 31 N.J. 299, 157 A.2d 319 (1960); *Bowers v. Camden Fire Ins. Assoc.*, 51 N.J. 62, 237 A.2d 857 (1968); *Rova Farms Resort, Inc. v. Investors Insurance Co. of America*, 65 N.J. 474, 323 A.2d 495 (1974); *see Estate of Louis Penn v. Amalgamated General Agencies*, 148 N.J.Super. 419, 372 A.2d 1124 (App.Div.1977); *Western World Insurance Co. v. All State Insurance Co.*, 150 N.J.Super. 481, 326 A.2d 177 (App.Div.1977) (same relationship implied into contract between primary insurer and excess carrier).

*Security Insurance Co.*[14] the New Jersey Supreme Court recently held that a failure to abide by the implied good faith covenant made an insurer liable for a settlement which the insured negotiated upon such breach, despite the fact that "the language [of the policy] read literally gives the insurer the absolute, unrestricted right to exercise those powers." [15]

The covenant of good faith and fair dealing and the actions founded upon it are not limited to the quasi-fiduciary circumstances surrounding the delegation of the right to settle claims that have been asserted against the policy holder. In *Association Group Life Inc. v. Catholic War Veterans*,[16] the New Jersey Supreme Court upheld a cause of action for breach of implied warrant of good faith by an insurance brokerage against the underwriter it formerly represented. The underwriter had arranged with the broker's customer to have the customer replace the broker in administering the policy. Although the contract provided that the customer should have the right to appoint a new broker, the New Jersey Supreme Court stated: [17]

> We agree . . . that [the underwriter] did not literally violate Article V in taking the above action. However, we are convinced that a jury could find that [the underwriter] breached its covenant of good faith which is implied in all contracts. *Palisades Properties Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965).

14. 72 N.J. 63, 367 A.2d 864 (1976).

15. 72 N.J. at 72; 367 A.2d at 869.

16. 61 N.J. 150, 293 A.2d 382 (1972).

17. 61 N.J. at 155, 293 A.2d at 384.

18. 61 N.J. at 154, 293 A.2d at 384.

19. 69 N.J. 125, 351 A.2d 349 (1976).

20. 69 N.J. at 130, 351 A.2d at 352. *See Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 207 A.2d 522 (1965) (New Jersey law implies covenant of good faith into every contract); *Mortgage Corp. of New Jersey v. Manhattan Savings Bank*, 71 N.J.Super. 489, 177 A.2d 326 (1962) (vigorously applying the principle of New York law that "A construction should not

The activities of the underwriter, it was held, were "not contemplated by the spirit of the contract and fell short of fair dealing." [18]

More recently, in *Bak-A-Lum Corp. v. Alcoa Building Products*,[19] the New Jersey Supreme Court granted contract damages to a dealer of aluminum siding whose supplier had terminated the exclusivity of the plaintiffs' dealership without notice. Although the terms of the contract between the parties allowed the supplier to terminate the dealership at will, the New Jersey Supreme Court held that where, with the supplier's knowledge, the dealer had embarked on a warehouse expansion in reliance on the exclusivity of its dealership, a termination without reasonable notice violated the implied covenant of good faith. The Court said:

> It may be true that defendant ordinarily would be under no strictly legal obligation to inform plaintiff that it was about to terminate its exclusive dealership . . . .. However, we have been at pains recently to point out that . . . "in every contract there exists an implied covenant of good faith and fair dealing."
> . . . In [the circumstances here] the defendant's selfish withholding from the plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith of which we have spoken.[20]

be given to a contract which will place one of the parties at the mercy of the other").

Another paradigm case illustrating the sensitivity of the New Jersey courts to the dictates of good faith and fair dealing is *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973). There, the court read a requirement that cancellation be "for cause" into the unilateral right of an oil company to cancel a dealer's lease. The majority distinguishes *Marinello* on the ground that the Schultzes may be in a stronger bargaining position than an ordinary "dealer-franchisee," and Morris Oil Company may have been in a weaker position than a major oil company.

As to the first suggestion, since the Schultzes' position was wholly financed by the oil company, and the oil company retained the right to cancel its lease at will, it is difficult to

The New Jersey courts thus no longer conceive of a contract solely as a private treaty in a bellicose state of nature, conferring privileges to be used at will out of avarice, pique or spite. Rather, a contract, particularly one involving a long-term relationship which places the welfare of one party in the hands of the other,[21] is understood to reflect the ethical tenor of the society within which the contract is formed, and creates the expectation that the powers it grants will be reasonably and equitably exercised.[22] The law of New Jersey protects such expectations. An exercise of contractual rights so arbitrary or unfair as to amount to bad faith is considered to constitute a contractual breach compensable by damages.[23]

C.

The question, then, is whether under the foregoing principles the Schultzes have adduced sufficient evidence to allow a jury to find that the actions of Chevron breached the implied covenant of good faith and fair dealing which certainly exists under New Jersey law today.[24]

As the majority notes, a right of first refusal clause is not void *per se* as illegal or unconscionable.[25] But such a conclusion

---

see how the Schultzes' bargaining leverage was more powerful than that of the ordinary franchisee. This is particularly so in view of the fact that the Schultzes labored under the medical requirement that they move promptly to a warmer climate.

And the second suggested basis for distinction would appear to cut both ways. If Morris' bargaining position was significantly less powerful than that of a major oil company, it would follow that the Schultzes could expect that in enforcing its right of first refusal, Morris would be forced to be more accommodating than a major oil company, since its position would not be as strong. The accession of Chevron to the position as the Schultzes' lessee/lessor would defeat such expectation.

**21.** *See Shell Oil v. Marinello, supra,* 63 N.J. at 409, 307 A.2d at 602 (franchisee has everything to lose from termination of franchise, oil company loses little); *Amerada Hess Corp. v. Quinn,* 143 N.J.Super. 237, 253, 362 A.2d 1258 (L.Div.1976) (noting "inevitable intertwining of the franchisee's livelihood with the franchise").

**22.** As Professor Unger expressed the general trend:

> The main reaction to the conflict between legality and solidarity is a greater willingness to regard as part of the law certain moral conceptions that do not seem capable of development and application in ways consistent with the ideals of generality and autonomy. For these conceptions can neither be reduced to rules nor divorced from views about moral obligation.
>
> An example in private law is the idea of good faith. . . . To act in good faith is to exercise one's formal entitlements in the spirit of solidarity. The good faith standard requires one to find in each case a mean between the principle that one party may disregard the interests of the other in the exercise of his own rights and the counter principles that he must treat those interests exactly as if they were his own.

R. Unger, Law in Modern Society, 210 (1976). *See* R. Pound, An Introduction to the Philosophy of Law, 188 (1922) ("Men must be able to assume that those with whom they deal in the general intercourse of society will act in good faith.").

It may be, of course, that the earlier conception of the contracting parties as atomistic entities bound only by the formalities of the contractual terms reflected the prevailing individualistic and laissez-faire attitudes of the broader society. Such arid formalism ill befits the current tone of the New Jersey courts, however.

**23.** The majority acknowledges the existence of the covenant of good faith in New Jersey contracts, but avoids that precept with the comment that "Such a broad principle, however, is of little assistance in the present factual situation." Majority opinion at 779.

This casual dismissal of a prominent feature of New Jersey's judicial landscape seems at odds with the role of a judge in the application of common law. Common law evolves through the interaction of abstract doctrine and palpable fact in the context of individual disputes. The judge must trace upon the circumstances of the specific case the projection of doctrinal developments. And conversely the court's task is to measure emerging legal precepts against the demands of practicality and conscience in particular factual matrices. But he is not free to slight a doctrine simply because its application is difficult.

**24.** Under New Jersey Law the issue is one for the jury. *Association Group Life v. Catholic War Veterans,* 61 N.J. 150, 151, 293 A.2d 382, 384 (1972); *Bowers v. Camden Fire Ins. Assn.,* 51 N.J. 62, 74, 79, 237 A.2d 857, 863 (1968).

**25.** It should be observed, however, that there is some conflict between the law's hostility toward restraints on alienation and the right of first refusal. *See Wellmore Builders, Inc. v.*

only begins the relevant inquiry, for the unfair or bad faith use of a concededly legal contractual term may still subject the abuser to an action for damages. Possession of a patent is not illegal, yet use of that patent in violation of an exclusive licensing agreement may generate civil liability. And a perfectly valid contractual provision allowing a party to demand assurance of compliance before completing his own performance will not permit the party to withhold performance for the purpose of harassment or a desire to obtain better payment terms. Similarly, here, the Schultzes do not challenge the validity of the preemptive rights in the abstract, but rather the use to which Chevron put those powers.

The right of first refusal clause before us in its inception constituted an effort by the oil company to secure the opportunity to retain the advantage of the good will developed by the service station which it financed. The clause allowed the oil company to assure the continued use of the station as an outlet for its products, while at the same time guaranteeing the dealer the right to dispose of his interest in the property. If a sale were contemplated, the oil company had the right to purchase the station, and operate it itself. In theory, as the majority puts it,

> a lessee's right of first refusal is a means of protecting him without placing a burden on the lessor; it has the effect of creating two prospective purchasers for every offer received by the owner.[26]

It is not, however, the theory underlying the right of first refusal about of which the Schultzes complain, but the reality of its operation in the context of this case. They contend that the evidence here showed that potential buyers of service stations refuse to submit firm offers to purchase until the lessee, here the oil company, has waived its right of first refusal. There is testimony from which a jury could conclude that such was the precise effect of the clause in this case. It not only created a "burden" on the Schultzes, but in practice prevented them from "receiving" offers.[27] Thus, in effect, the Schultzes could sell only with Chevron's approval.

If Chevron used the clause to preserve its opportunity to purchase the facility when the Schultzes decided to sell it, no objection could validly be raised. But the Schultzes' position is that Chevron withheld its waiver in a manner that was both unfair and unreasonable under the circumstances. If Chevron unfairly used the clause not to preserve its right to purchase but to extract better terms for a subsequent lease, a jury could find that such coercion fell outside of the bounds of fair dealing which implicitly cabined the contractual power.

The restriction imposed by Chevron's preemptive rights on the ability of the dealer to dispose of its property bore particularly heavily on the Schultzes because the health of Mrs. Schultze necessitated relocation in Florida. Medical considerations counseled reasonable dispatch in leaving, and resettlement would require prompt disposition of the station. For without personal management by the Schultzes, the good will associated with the station would dissipate and sale negotiations from Florida would perforce be less effective than if performed in person. Yet, despite demand, the release of the right of first refusal was not proffered until the month before the Schultzes had to

---

*Wannier*, 49 N.J.Super. 456, 140 A.2d 422, 428 (1958); ALI Restatement of Law of Property § 413(2)a and comment (f) (1941).

**26.** Majority opinion at 780.

**27.** Kellogg Birdseye, an experienced speculator in gasoline stations, who had manifested an interest in the Schultzes' property but refused to continue negotiations in the absence of a waiver, testified that it was his policy to refuse to negotiate purchase arrangements with dealers unless he received a written release of the

first refusal right. N.T. 1.65. *See* N.T. 7–8 (December 2, 1976). Similarly, there was testimony that one Wright Hitt had expressed an interest in buying the station, contingent upon first obtaining Chevron's waiver. N.T. 17–19 (December 2, 1976). And Robert Becker, a real estate agent who testified that he had been "ready, willing and able" to buy the Schultzes' property for $120,000, N.T. 1.80, 1.74, indicated that one of the reasons the purchase was not consummated was a failure to obtain a release from Chevron. N.T. 1.84–1.85.

depart for Florida, although there is evidence that Chevron knew of both the need by the Schultzes to relocate and the effect of its failure to waive the first refusal right.

It could be asserted, of course, that the burden imposed by Chevron's preemptive rights was freely bargained for in the initial contract between the Schultzes and Morris Oil, and that Chevron's refusal to waive its preemptive rights was a simple good faith exercise of its contract privilege. Such argument, however, appears to rest on the premise that Chevron had some interest in purchasing the service station. Absent evidence of such an intent, Chevron could not be said to be asserting the interests protected by the clause, and its actions could be deemed by a jury to be a mere arbitrary infliction of a burden upon the Schultzes without a justifiable business reason.

In fact, there is testimony that Chevron had decided against purchase of the station as early as 1970, two years before it finally granted the release.[28] Moreover, John Ginos, Chevron's retail sales manager, testified that in August of 1971, in response to a request for a waiver from the Schultzes, he had stated that he could "see no problem with that" and had avowed that he would obtain the waiver.[29] Yet, the release was not delivered for a year after that statement, during which time Chevron attempted to negotiate a new lease with the Schultzes. It was thus possible for the jury to infer that Chevron's refusal to grant the waiver had nothing to do with the rights which the provision was designed to secure, but instead amounted to an attempt to coerce the Schultzes into new leasing arrangements by holding their equity in the station hostage.

In my judgment, under New Jersey law, such a course of action by Chevron could reasonably be found by the trier of fact to violate the implied covenant of good faith and fair dealing. Accordingly, I believe that the case should not have been taken from the jury, and the trial judge's action in so doing requires reversal of the judgment.

---

**28.** N.T. 2.95, 3.9, *cf.* N.T. 5 (December 2, 1976).

