George ARNOTT, Appellee,

v.

The AMERICAN OIL COMPANY, a corporation, Appellant.

No. 79–1150.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1979.

Decided Oct. 24, 1979.

Rehearing and Rehearing En Banc Denied Nov. 29, 1979.

---

Maurice R. Glover, Chicago, Ill., argued and Timothy J. Nimick, Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., on brief, for appellant.

Michael F. Pieplow and Edwin E. Evans, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for appellee.

Before HEANEY, BRIGHT and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Defendant-appellant, American Oil Company (Amoco), appeals from a judgment entered against it by the district court[1] upon a jury verdict of $100,000 (trebled by the court under the antitrust laws to $300,000 plus attorney fees and costs) and punitive damages of $25,000. Numerous issues are raised, including insufficiency of the evidence to create submissible jury issues on plaintiff's claims. We affirm on condition that plaintiff-appellee, George Arnott, file a remittitur of all damages exceeding $125,000 plus interest and costs.

This action involves the relationship between a major oil company, Amoco (often referred to in the record as Standard Oil), and George Arnott, one of its service station dealers. On August 6, 1973, Amoco terminated Arnott as a Standard Oil dealer by terminating his lease and evicting him from the service station. Arnott's complaint alleged, and the jury found in answer to special interrogatories accompanying the general verdict, that (1) Amoco was guilty of false and fraudulent representations in inducing Arnott to execute the service station lease agreement;[2] (2) Amoco breached the fiduciary duty owed to Arnott by terminating his lease without good cause and by not dealing with Arnott in good faith during the term of the lease agreement; (3) Amoco was guilty of a retail price-fixing combination in violation of the antitrust laws; and (4) Amoco breached its promise to pay certain legal fees and expenses in the amount of $393.75 incurred by Arnott in a state court action involving a suit brought by Amoco against Arnott and the former lessee of the service station in question.[3]

---

1. The Honorable Fred J. Nichol, Chief Judge, United States District Court for the District of South Dakota.

2. Arnott also claimed that during the operation of the lease agreement Amoco misrepresented the benefits to be received by Arnott from the installation of a carwash.

3. In instructing the jury the court stated: "This is not disputed by the plaintiff (sic)." No further reference is made to this $393.75 item until Amoco in its reply brief complains that the court elected not to charge the jury on this issue and thus the judgment should be reversed. Earlier in the trial proceedings Amoco's counsel indicated there was no dispute

## I. Facts.

The record when viewed most favorably to the jury verdict for Arnott discloses the following. In October 1971 Arnott was operating a Standard Oil station in Minneapolis, Minnesota,[4] when he was approached by Amoco's sales manager for the Sioux Falls district, Dick Lucas, about operating a Standard station at an interstate location in Sioux Falls, South Dakota. Arnott declined. He was again contacted by Lucas in late 1971 and, as a result, flew to Sioux Falls. Lucas showed Arnott projected profit figures on the service station which were considerably better than those from Arnott's Minneapolis station. Arnott agreed to make the change. He entered into a lease agreement dated February 18, 1972, for a one-year period. It was then a standard policy of Amoco to issue only one-year leases, but there was also evidence at the trial that these leases were routinely renewed on an annual basis if the dealer operated the station in a reasonable manner. Arnott testified that it was his understanding that as long as he operated the station in a reasonable manner and it was a profitable venture for himself and Standard Oil, he could have it for as long as he wanted, which was in accord with his experience as a Standard Oil dealer.

The lease required the service station to remain open twenty-four hours a day. There was no specific agreement that Amoco would supply any specified amount of gasoline to the station. The lease was later amended in certain details. At the time the lease was executed, Arnott was given a written Statement of Policy issued by Amoco which set out the dealer-company relationship. Arnott was familiar with it as it was read as a part of the dealer indoctrination schools which Arnott attended and was followed by Amoco at Arnott's prior Standard Oil stations.

The Statement of Policy contained several provisions which were repeatedly violated by Amoco employees.[5] The Policy provi-

about this item. Under the circumstances we pretermit any further discussion of the same.

4. Prior thereto Arnott, after attending a two-week training school sponsored by Amoco, had operated Standard Oil stations at Lake Preston, Wessington Springs, and Huron, South Dakota, during the period 1960–67. He discontinued his dealership in 1967 to become a life insurance salesman. In 1970, after again attending a dealer training school, he opened the Minneapolis station.

5. Since the Statement of Policy contained several representations which Arnott claims were false and fraudulent and made with intent to deceive, which were relied upon by Arnott in entering into the lease agreement with Amoco, and which form the basis for his claim for damages as a result thereof, pertinent portions are set out as follows:

STATEMENT OF POLICY

Since we first began leasing service stations to independent dealers over 35 years ago, this company has been committed to a policy which recognizes that the dealers it serves are independent businessmen who have the right to run their stations free from coercion or improper pressure on the part of any Company representative. * * *.

    *    *    *    *    *    *

FIRST, with respect to our gasoline, we believe every dealer must use his best efforts to promote their sale to the motorist. We believe every dealer should provide prompt and courteous service and just treatment to customers, hire adequate help, maintain reasonable hours of operation and keep the premises in a clean and attractive condition.

SECOND, with respect to motor oils, we expect you as a minimum to stock and display our line of oils, since most motorists who buy our gasolines also wish to purchase our motor oils. However, no Company representative may bring any pressure to bear on you if you also choose to handle some competitive brands.

THIRD, with respect to tires, batteries, and accessories, you have complete freedom to buy these products from whomever and in whatever quantities you choose. The Company will not tolerate coercion, harassment, or improper pressure of any kind by our salesmen in the sale of these products. However, because we believe our line of TBA offers you an unparalleled opportunity for additional profit, we expect our salesmen to call your attention to the merits of our products and try to sell them to you.

FOURTH, with respect to all products, you have an absolute right to set your own resale prices except in states where Standard Oil products are fair traded. You also are free to display and promote your products as you see fit. While we have developed a wide variety of advertising, sales promotion and merchandising programs which we believe will assist you in your sales efforts, you are free to reject them if you desire. We will, of

sions which the record discloses were violated by Amoco may be summarized as follows: (1) Arnott would be an independent businessman who would have the right to run his station free from coercion or pressure on the part of any company representative; (2) no company representative would bring any pressure to bear on Arnott if he chose to handle competitive brands of motor oils; (3) with respect to tires, batteries, and accessories, Arnott would have complete freedom to buy these products from whomever he chose; the company would not tolerate coercion, harassment, or improper pressure of any kind by its salesmen in the sale of these products; (4) Arnott would have the absolute right to set his own resale price with respect to all Standard Oil products, including gasoline, and would be free to display and promote all products as he saw fit; and (5) Arnott would not be pressured into participating in advertising, sales promotions, or merchandising programs sponsored by the company.

On several occasions when Arnott placed competitive brands on display along with Standard Oil products, he was instructed by Amoco to remove the same. On one occasion Arnott purchased and placed on display Goodyear tires. Amoco's highest ranking dealer representative in South Dakota, Jack Reutschler, told Arnott that he should return the Goodyear tires and display only Atlas tires (Standard's brand) if he wanted to continue to operate the station. Arnott returned the Goodyear tires and discontinued selling them. Furthermore, Arnott's purchase of Standard's motor oil from a local wholesale distributor was discontinued by the wholesaler on instructions of Amoco, thereby requiring Arnott to purchase motor oil directly from Amoco. Arnott was also required to purchase Green Stamps, which he did at a cost of $3,000. Amoco threatened nonrenewal of his lease if he refused to do so. During the time Arnott operated his station, he received telephone calls from Amoco representatives instructing him to raise or lower his retail gasoline prices. When he deviated from Amoco pricing directives, Arnott was threatened with nonrenewal of his lease.

In addition, the evidence discloses that during the course of the lease agreement Amoco misrepresented the benefits to be received by Arnott for the installation of a carwash. Arnott was persuaded to purchase a carwash from Amoco for $15,430. In turn, a lease rider effective June 1, 1972, was entered into whereby Arnott was to receive a minimum monthly rebate. On October 13, 1972, Amoco cancelled the carwash rider agreement and presented Arnott with a new lease that substantially increased the amount of gallonage sales necessary before a rebate could be realized. This had the effect of reducing by one-half the monthly rental rebate paid to Arnott under the carwash agreement. In addition, the carwash installation necessitated the removal of a car hoist in one of the service bays. An Amoco representative stated that a new hoist compatible with the carwash would be installed. The new hoist was never received, and thus the station's capacity for mechanical work was reduced by half.

The difficulties Arnott had with Amoco over the misrepresentations made orally and those contained in the Statement of Policy and the carwash agreement described above took place during the first year Arnott operated the station. On one occasion a representative of Amoco suggested that Arnott move to a new location which was less desirable. Arnott refused to consider it.

Arnott signed a new lease agreement on December 8, 1972, effective February 19, 1973, for an additional one-year term. Arnott was not given a copy of the executed lease until June 1973. During the interim from February through May 1973 Arnott operated the station without a lease. He was advised by Amoco representatives that he was on probation and would not be given a lease unless he agreed to abide by the prices set by Amoco and to participate in their promotional programs. Arnott agreed

course, give you our suggestions and advice on all of these matters based on our long experience in the business, but you alone must decide your own course of action.

to be cooperative in order to secure the lease renewal.

However, the problems continued. Amoco representatives visited the station twice a week. If matters were not handled to their satisfaction, Arnott was reminded that if he wanted to continue at his location, he would have to comply with Amoco's requirements.

The severe nationwide gas shortage which occurred in the spring of 1973 brought additional problems. On May 1, 1973, Amoco established an allocation program for each Standard Oil dealer. Arnott followed the allocation program and limited sales to customers. Nevertheless, he often exceeded his daily allocations and on several occasions ran out of gasoline.

Eventually Amoco's representative, Dick Lucas, suggested a program whereby Arnott was to place signs up in the daytime indicating that he was out of gasoline and then in the evening, when the service stations downtown would close, he was to remove the signs and sell gasoline. The purpose was to send motorists downtown in the daytime. Arnott refused because the costs were prohibitive. His main product was gasoline. To remain open during the daytime for oil changes and grease jobs was too costly.

During the last two weeks of his operation Arnott ran out of gasoline most evenings and eventually closed the station because it was not profitable to remain open. In addition, customers became very irate after pulling into the station only to find gasoline unavailable.

Arnott advised Amoco of his situation and that he was closing down from 10:00 p. m. to 6:00 a. m. However, Amoco advised Arnott that he was in violation of the lease in failing to maintain a 24-hour operation.

Arnott became frustrated, and on July 17, 1973, he signed a cancellation agreement to voluntarily leave the station. Later in the day he reconsidered his position and called an Amoco representative to rescind his consent to the cancellation. A few days later Amoco marketing representative,

Clint Bucklin, told Arnott that if he cooperated with Amoco's policies, he could keep the station. The next day Bucklin advised Arnott that Bucklin apparently had acted without authority and that Arnott would be removed August 6, 1973. A formal letter to that effect dated July 26, 1973, was mailed to Arnott, who then retained counsel. Amoco was advised by letter that its August 6 takeover was being treated by Arnott as an involuntary cancellation of the lease. Arnott left the station August 6, 1973. On that date Amoco hand-delivered a letter to Arnott advising him that his lease was being cancelled effective September 5, 1973, because of violation of the 24-hour clause in the lease. Subsequently Amoco leased the station to J. K. Sadler, and Arnott sold his Standard Oil inventory and carwash to the new lessee. Additional facts disclosed by the record will be reviewed in connection with discussion of the issues raised by Amoco in this appeal.

II. Fraud and Deceit.

Amoco initially contends that there is no evidence of any misrepresentations, much less evidence of misrepresentations of a material fact; no evidence that the statements claimed to be false were knowingly false when made; and no evidence of an intent to defraud. These contentions have already been answered in our discussion of the facts above and require no further elaboration. We of course view the evidence together with all reasonable inferences to be drawn therefrom in the light most favorable to the jury verdict. After reviewing the record, we are inclined to agree with the statement made by the district court in denying Amoco's motion for a directed verdict:

I must confess that I'm somewhat shocked with the manner in which the evidence shows that the Standard Oil Company undertook to negotiate the lease, and to try to, in its dealings with the dealer in connection with its lease, to completely frustrate the antitrust law, and the decisions under it, in the manner in which they did this.

First of all, they go and get this—they negotiate this lease. They put as an ad-

dendum to the lease a receipt acknowledging that the lessee has received a copy of the policy statement of the Standard Oil. * * * And then they proceed to violate practically every single one of the paragraphs in the policy statement.

■ Fraud, like other issues of fact, may be established by inferences arising from all the other facts and circumstances in evidence. *Aschoff v. Mobil Oil Corp.*, 261 N.W.2d 120, 124 (S.D.1977); *Funke v. Holland Furnace Co.*, 78 S.D. 260, 102 N.W.2d 668, 670 (1960). The record amply supports the jury finding, implicit in its verdict and answer to the pertinent interrogatories, that Amoco was guilty of misrepresentations of a material fact, that the misrepresentations were known to be false when made and were made with intent to defraud, and that Arnott relied thereon in entering into a lease agreement with Amoco.

■ Amoco further contends that in any event Arnott's reliance thereon did not proximately cause the loss of his station or any other loss because the initial lease had expired. The short answer is that Arnott, based on his previous experience operating Standard stations and on representations made by Amoco's Dick Lucas prior to Arnott's leaving Minneapolis and entering into the first Sioux Falls lease, was led to believe that he was entering into a dealership with excellent prospects for an extended period of time as long as he performed satisfactorily as a dealer. Under the circumstances, the jury could find that the mere fact that the initial lease had been amended to provide for the carwash installation and had later been renewed by a second one-year lease did not deprive Arnott of his anticipated long-term dealer relationship with Amoco at the new location.

■ Amoco's contention that the testimony regarding the alleged misrepresentations violated the parol evidence rule is not well taken. Such testimony is permitted when a contract is induced or procured by fraud. *Sabbagh v. Professional & Business Men's Life Ins. Co.*, 79 S.D. 615, 116 N.W.2d 513, 520 (1962).

Amoco additionally contends that even if the representations claimed to be fraudulent were fraudulent, they were made prior to the execution of the renewal lease, which was executed on December 8, 1972, for an additional one-year period, and that Arnott had full knowledge of such falsity when he executed the new lease and the amendments thereto concerning the carwash. Thus Arnott waived any right to sue for such alleged fraudulent representations; *see Taute v. Econo-Car Int'l, Inc.*, 414 F.2d 828 (9th Cir. 1969); *Commodity Credit Corp. v. Rosenberg Bros. & Co.*, 243 F.2d 504, 512 (9th Cir.), *cert. denied*, 355 U.S. 837, 78 S.Ct. 62, 2 L.Ed.2d 48 (1957); and Arnott is estopped from questioning the validity of the lease agreement and provisions therein. *See Schutterle v. Schutterle*, 260 N.W.2d 341, 350 (S.D.1977). Moreover, Arnott entered into an accord and satisfaction with Amoco by the negotiation and execution of the lease rider agreements and acceptance of payments thereunder. S.D. Compiled Laws §§ 20–7–1, et seq. (1967).

■ The district court fully instructed the jury on the defenses urged by Amoco of waiver, estoppel, and accord and satisfaction. The instructions were proposed by Amoco. Each defense involved factual issues which were determined against Amoco by the jury. The record amply supports the jury's resolution of these issues. For example, it can hardly be said on this record that Arnott, with full knowledge of the fraud, asked for and received a material concession from Amoco. *See United Forest Prod. Co. v. Baxter*, 452 F.2d 11 (8th Cir. 1971). The matter of the amount of damages proximately caused by Amoco's fraud and deceit will be discussed under "V. Damages," *infra*.

III. Fiduciary Relationship.

Arnott alleged that Amoco breached the fiduciary duty owed to Arnott by terminating his lease without good cause and by not dealing with Arnott in good faith during the lease term. The court instructed the jury that a fiduciary relationship existed

between the defendant and the plaintiff.[6] Amoco contends that the evidence does not support the existence of a fiduciary relationship and that the court erred in instructing that the relationship existed as a matter of law. Further, Amoco argues that it properly terminated Arnott's lease for failure to maintain a 24-hour operation as set out in the lease.[7]

Although the existence of a fiduciary relationship is a close question, the dealer-oil company relationship has been the subject of much recent litigation, and the current trend of authority recognizes that a franchise relationship exists between a service station dealer and the oil company whose trademark the dealer is promoting. Inherent in a franchise relationship is a fiduciary duty.

A New Jersey court ruled that a franchise existed between tenant-dealer Marinello and landlord Shell Oil Co. in *Shell Oil Co. v. Marinello*, 120 N.J.Super. 357, 294 A.2d 253 (1972), aff'd, 63 N.J. 402, 307 A.2d 598 (1973), cert. denied, 415 U.S. 920, 94 S.Ct. 307, 39 L.Ed.2d 475 (1974).

The fact that Shell here asserts its rights as a landlord to terminate a lease is not the end of the inquiry. It is now recognized that a lease is simply a species of contract which happens to concern real estate, and we must determine under principles of contract law the construction of the document in question in a manner consistent with the true intent and purpose and the reasonable expectations of the parties as suggested not only by the contents of the instrument but the whole of the relationship that existed between them. * * *.

Furthermore, it should be apparent that we are not dealing here with a traditional landlord-tenant relationship but with what is essentially a form of commercial venture—a franchise—for the marketing of Shell's products, in which both parties have a common interest and profit from the activities of the other. Shell's interest in these premises is obviously more than the interest of a landlord, and Marinello's interest transcends that of a tenant—his investment and very livelihood depend on his remaining within the good graces of Shell's local

6. [Y]ou are instructed that a fiduciary relationship existed between the defendant and the plaintiff. A fiduciary relationship is one founded on trust or confidence placed by one person in the integrity and fidelity of another person. Out of such a relation, the law requires that neither party exert undue influence or pressure upon the other, take selfish advantage of his trust or deal with the subject matter of the trust in such a way as to benefit himself or prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of the other person involved.

7. In this connection the district court further instructed the jury *inter alia*:

   If you find that the circumstances presented during the time period in question were such that the reason for maintaining a 24-hour operation could not be fulfilled, then you may consider that fact in deciding whether the plaintiff substantially performed his obligations under the terms of the lease, notwithstanding his failure to maintain a 24-hour operation.

   You are instructed that under the laws of the State of South Dakota that the terms of the contract may be implied if manifested by the conduct of the parties. Therefore, if you should find that under all the facts and cir-

cumstances presented, that the defendant's conduct implied that it would supply plaintiff with sufficient quantities of gasoline and other petroleum products to enable the plaintiff to maintain a 24-hour operation, then you may also find that the defendant's failure to fulfill that implied condition would excuse the plaintiff's failure to maintain a 24-hour operation of the station.

   You are instructed that under the laws of the State of South Dakota the failure of a party to perform under the terms of an agreement is excused when the party's performance is prevented by the act of the other party, or by the operation of law.

The district court further instructed as follows as to the essential elements which plaintiff must establish:

   First, that the defendant terminated its lease with the plaintiff without good cause. In this regard, good cause is defined as the failure by plaintiff to substantially perform his obligations to the defendant under the terms of the lease;

   Second, that as a direct and proximate result of the defendant's termination of the lease, the plaintiff suffered a loss; and

   Third, the monetary amount of that loss.

employees who, as the record here demonstrates, exercise final and absolute authority over his tenure as a Shell dealer. *Id.* 294 A.2d at 261 (citations omitted). *See Amerada Hess Corp. v. Quinn,* 143 N.J.Super. 237, 362 A.2d 1258 (1976).

More recently, the Pennsylvania Supreme Court determined in *Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978), that while the dealer and oil company were landlord and tenant, their lease and business practices indicated a franchise relationship. The court defined a franchise as a license from the owner of a trademark which permits another to sell a product or service under the name or mark. *Id.* 390 A.2d at 740, *quoting from Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207, 211 (1976). Razumic purchased fuel and other products from Arco and resold them under the Arco trademark. Razumic was required to have his station open twenty-four hours a day, to maintain adequate and efficient attendants, and to allow Arco to inspect the station.

The course of performance pursuant to the agreement between the parties was considered a strong indication of their relationship. *Id.* 390 A.2d at 741 n.6. Because the facts showed the actual practice of a franchise relationship, the court did not feel it was significant that the service station lease had not specified a franchise relationship. In ruling that a franchise relationship existed, the court determined that "it is clear that Razumic was not pursuing solely his own business interests. Rather, Razumic conducted his business and sold his products in accordance with methods prescribed by Arco." *Id.* 390 A.2d at 740.

■ It is likewise clear that Arnott was not pursuing solely his own business interests in his relationship with Amoco. Arnott sold Amoco products under the Amoco trademark, was expected to remain open twenty-four hours a day, was responsible for hiring adequate help, and was subject to inspections from Amoco representatives. Further examples of Amoco's control are Amoco's pricing directives, Amoco's requirement that Arnott purchase Green Stamps,

and Amoco's control over Arnott's product advertising as indicated by the forced return of the Goodyear tires. Obviously, a franchise relationship in which Arnott and Amoco had a common interest and profit in the activities of each other, and not the typical landlord-tenant relationship, existed.

■ A franchisee, unlike a tenant pursuing his own interests, builds the goodwill of his own business and the goodwill of the franchisor. *Atlantic Richfield Co. v. Razumic, supra,* 390 A.2d at 742. This facet of the relationship has led to the recognition that the franchise relationship imposes a duty upon franchisors not to act arbitrarily in terminating the franchise.

> [A]n Arco dealer such as Razumic can justifiably expect that his time, effort, and other investments promoting the goodwill of Arco will not be destroyed as a result of Arco's arbitrary decision to terminate their franchise relationship. Consistent with these reasonable expectations, and Arco's obligation to deal with its franchisees in good faith and in a commercially reasonable manner, Arco cannot arbitrarily sever its franchise relationship with Razumic. A contrary conclusion would allow Arco to reap the benefits of its franchisees' efforts in promoting the goodwill of its name without regard for the franchisees' interests.

*Id.* 390 A.2d at 742 (footnote omitted). *See Seegmiller v. Western Men, Inc.,* 20 Utah 2d 352, 437 P.2d 892 (1968); *Ashland Oil, Inc. v. Donahue,* 223 S.E.2d 433 (W.Va.1976); Brown, *Franchising—A Fiduciary Relationship,* 49 Tex.L.Rev. 650 (1970–71).

In *Shell Oil Co. v. Marinello, supra,* 294 A.2d at 262, 263, the court ruled that public policy required a term to be implied in the service station lease that the lessor cannot refuse to renew the lease without good cause. The court stated:

> Surely no person would make the kind of investment in money, time and effort as did Marinello without the reasonable expectation that if he substantially performed his obligations to Shell, the latter would in turn continue to renew his lease

and dealership. He was, by virtue of Shell's dominant position in their relationship and the legal structure of the agreements whose terms he could not vary, compelled to rely upon Shell's good faith in living up to these expectations. *Id.* 294 A.2d at 262.

Further indication of the fiduciary nature of a franchise relationship is found in the recent surge of general franchise legislation. As of May 1, 1977, legislation under which franchisors are prohibited from terminating franchises prior to the end of their terms without good cause, are required to make payments for goodwill if franchises are terminated or not renewed at the end of their term, or are prohibited from failing to renew franchises at the expiration of their terms without good cause has been adopted in twelve states and Puerto Rico. Baird, Hay & Bailey, *Government Regulation of Real Estate Franchising*, 112 Real Prop., Prob. & Tr. J. 580, 594 (1977). Congress has recently enacted legislation specifically regulating the relationship between service station dealers and their franchisors in the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* (1978). "Congress sought to remedy a situation which had led to 'numerous complaints by franchisees of unfair terminations or non-renewals of their franchises by franchisors for arbitrary and even discriminatory reasons.'" *Saad v. Shell Oil Co.*, 460 F.Supp. 114, 115 (E.D. Mich.1978), *quoting from* S.R. 95–731 at 17. The Act prohibits the franchisor from terminating or failing to renew a franchise relationship except under specific conditions and for specific grounds. *Frisard v. Texaco, Inc.*, 460 F.Supp. 1094, 1097 (E.D.La. 1978).

█ South Dakota, in accord with this modern trend, enacted the South Dakota Franchise Act, S.D. Compiled Laws, ch. 37–5A (1977) in 1974. S.D. Compiled Laws § 37–5A–66(7) (1977) prohibits unfair or inequitable terms or conditions in franchise agreements and unfair or inequitable practices by the franchisor. Although this statute is not controlling since the Arnott lease agreement was initiated in 1973. It is relevant in determining South Dakota's position regarding franchise terminations. In both *Shell Oil Co. v. Marinello, supra,* 294 A.2d at 263, and *Atlantic Richfield Co. v. Razumic, supra,* 390 A.2d at 743, the courts' decisions relied on the public policy exemplified by the state statutes though the statutes were not controlling because they were enacted after the parties had established their franchise relationships. The statutes were viewed as reinforcing the obligations inherent in a franchise relationship. The South Dakota statute indicates that in South Dakota unfair or inequitable practices by a franchisor will not be tolerated. South Dakota law therefore indicates that the franchisor and franchisee of a service station operation are involved in a fiduciary franchise relationship whereby the parties should act with good faith toward each other. Judge Nichol, during an informal discussion of Amoco's motion for a directed verdict, indicated it was his view that South Dakota, in enacting the 1974 Franchise Act, "was codifying what was really the common law in South Dakota, anyway." It was the court's opinion that, in light of Amoco's superior position in dictating the terms of the lease agreement, the relationship of the parties was a matter of law.[8] We give great weight to the district court's view of state law. *American Motorists Ins. Co. v. Samson,* 596 F.2d 804, 807 (8th Cir. 1979); *Gatzemeyer v. Vogel,* 544 F.2d 988, 992 (8th Cir. 1976).

---

**8.** It is true, as Amoco contends, that the court's instruction was taken from *Mobil Oil Corp. v. Rubenfeld,* 72 Misc.2d 392, 339 N.Y.S. 623 (N.Y.City Civ.Ct.1972), a case in which the determination that a fiduciary relationship existed between the dealer and the oil company was reversed on appeal. In reversing, however, the court noted that the New York legislature had passed a franchise statute, but the bill was vetoed by the governor and did not become law. The court concluded that New York, therefore, had negated any fiduciary policy of termination only for cause by failing to enact the statute. *Mobil Oil Corp. v. Rubenfeld,* 48 A.D.2d 428, 370 N.Y.S.2d 943, 949 (Sup.Ct. 1975). This is plainly distinguishable from the instant case due to South Dakota's Franchise Act.

■ In light of the undisputed facts in this case, it is our view that the district court did not err in instructing that a fiduciary relationship existed between the parties and in instructing that the law requires that neither party exert undue influence or pressure upon the other. *See* note 6 *supra.* In any event, when the instructions on breach of fiduciary duty are considered as a whole, error, if any, was harmless. *See* note 7 *supra.*

■ We are satisfied that the evidence amply supports the jury's finding that Amoco breached its "fiduciary" duty of good faith and fair dealing with Arnott in terminating its lease agreement with Arnott without good cause and that as a direct and proximate result of the termination Arnott suffered damages.

## IV. Violation of the Antitrust Laws.

■ Arnott charged that during the time he operated his service station, various Amoco representatives instructed him to raise or to lower his retail gas prices to specified levels at specified times; that when he did attempt to vary his retail gasoline prices from those specified by Amoco, he was threatened with cancellation or non-renewal of his short-term station lease; that as a result of Amoco's price-fixing activities he lost profits on gasoline sales during the term of his lease; and that his lease was cancelled because, among other reasons, he failed to follow the pricing directives of Amoco representatives, thereby causing him loss of his business and loss of future profits.

Amoco denied that it violated any antitrust laws or that it attempted to infringe upon or restrict free trade or fix prices to restrain competition or otherwise. By way of affirmative defense, Amoco alleged that Arnott made his own judgment regarding operation of the station; that if there were any representations made in connection with gasoline prices, Arnott, by renewal of his lease and riders thereto, acquiesced in such conduct and cannot now be heard to complain; and that the lease itself gave Amoco the absolute right to terminate the same on any material violation thereof, which it contends occurred when Arnott failed to operate said station twenty-four hours a day, seven days a week, as specified in the lease.

Amoco contends that there was insufficient evidence to create a submissible jury issue on price-fixing. We disagree. Although there were conflicts in the testimony of other dealers as to whether Amoco's calls regarding retail prices for gasoline were merely suggestions, there was sufficient evidence upon which a jury could find that retail prices were dictated by Amoco. For example, Mrs. Bill Pasco testified that she and her husband operated a Standard station in the same general area during the same period and that they would receive calls from Amoco representatives stating what price should be posted. She added, "I would say it was not a suggested price." If they deviated, "we would be checked, and my husband, he would have conversation with them. * * * We would take and put our prices where they had stated." Similarly, Greg White, who operated a Standard station in Sioux Falls during the relevant period, testified that representatives of Amoco would call, stating "your cost is this, and your selling price is this." At times when he deviated, he received calls from Standard representatives: "That— you know, we should fall in line with other dealers. * * * they'd remind you next February your lease is coming up."

Arnott testified that representatives of Amoco would call and tell him what the retail price was to be, and when he failed to comply, he would receive further calls advising him that he was not in compliance; that his second one-year lease was withheld during February-May 1973 and he was placed on probation until he agreed to abide by the prices set by Amoco; and that a couple of days after Arnott in frustration signed a mutual cancellation agreement and then rescinded the same, he was advised by an Amoco representative that he could keep the station if he cooperated with resale pricing and other directives. Shortly thereafter, by letter dated August 6, 1973, Amo-

co notified Arnott that it was cancelling his lease effective September 5, 1973, for failure to keep the station open for operation twenty-four hours a day. Arnott's testimony with respect to coercion by Amoco's representatives in connection with the fixing of the retail price of gasoline was also corroborated by the testimony of former employees. The witnesses generally testified in terms of Amoco "fixing prices"; one witness described Arnott's price as usually being "one cent higher."

■■■ Any resale price-fixing, whether by combination or agreement, is a per se violation of section 1 of the Sherman Act, 15 U.S.C. § 1.[9] In *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the Supreme Court noted that "agreements to fix maximum prices 'no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.' " *Id.* at 152, 88 S.Ct. at 873, *quoting from Kiefer-Stewart Co. v. Seagram & Sons*, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Furthermore, "a supplier may not use coercion on its retail outlets to achieve resale price maintenance. * * * [I]t matters not what the coercive device is." *Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964).

In *United States v. McKesson & Robbins*, 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956), the Supreme Court emphasized:

It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act and that its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the

agreement is to raise or to decrease prices.

*Id.* at 309–10, 76 S.Ct. at 940 (footnotes omitted).

In *Albrecht v. Herald Co., supra*, 390 U.S. at 149, 88 S.Ct. [869] at 871, the Supreme Court in discussing *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), observed: "The combination with retailers arose because their acquiescence in the suggested prices was secured by threats of termination; the combination with wholesalers arose because they cooperated in terminating price-cutting retailers."

In the instant case there is evidence from which the jury could find that Arnott and other dealers were forced by means of threats and other coercive tactics to set gasoline retail prices at prices fixed by Amoco. Amoco's threat not to renew the annual lease was enough to make the dealers toe the line. In this context the suggested price became the required price. *See Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 37–41 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Phillips v. Crown Central Petroleum Corp.*, 395 F.Supp. 735, 760–64 (D.Md.1975).

The jury could find from the evidence in the case that Amoco's actions constituted an unlawful combination under either of two theories: (1) That a combination existed between Amoco and Arnott at those times he complied, even though unwillingly, with Amoco's pricing directives; and (2) that Amoco had combined with other dealers who acquiesced in the enforced pricing policy. *Albrecht v. Herald Co., supra*, 390 U.S. at 150 n. 6, 88 S.Ct. 869. We are satisfied that the evidence supports the jury finding of price-fixing in violation of the Sherman Act.

■■■ Amoco further urges that Arnott failed to show a causal connection between the alleged unlawful price-fixing combination and the termination of his lease. We cannot agree. The evidence discloses that a

---

9.  15 U.S.C. § 1 reads in part: "Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal[.]"

representative of Amoco told Arnott that he could keep the station if he were more agreeable in adhering to Amoco's pricing policies. It is also noted that other dealers were allowed to reduce their hours of operation during the gasoline shortage. The jury could infer that Arnott's failure to follow Amoco's pricing directives was the proximate cause of the termination of his lease and subsequent loss of income as a result thereof.

## V. Damages.

■ Initially Amoco contends that Arnott has failed to establish the fact of damage resulting from unlawful acts on the part of Amoco. The fact of damage arising from Amoco's price-fixing activities has been discussed above. Arnott's claim for damages arising out of his contention that Amoco fraudulently induced him to enter into the lease agreement is also based on wrongful termination of the lease. He testified that he sold his home and his business in Minneapolis and acquired the dealership in Sioux Falls upon the representations of Amoco that as long as he operated the service station in a reasonable manner and it was a profitable venture for himself and Standard Oil, he could continue to operate the station. The fact of damage is Arnott's loss of a profitable business caused by Amoco's wrongful termination of the lease.

## VI. Amount of Damages.

Arnott's claim for damages on all three complaints of Amoco's (1) fraudulent misrepresentations in inducing him to enter into the lease agreement, (2) breach of fiduciary duty, and (3) violation of the antitrust laws is based on loss of future profits. In this connection Arnott offered the expert testimony of Dr. Dennis Johnson, Professor of Economics at the University of South Dakota. Basically Dr. Johnson computed Arnott's average income with the Standard station during the years 1972–73 and compared the same with Arnott's average income without the station in 1971 and 1974–77. The figures were obtained from Ar-

nott's income tax returns. After computing the difference of $11,886, Dr. Johnson multiplied that figure by Arnott's work life expectancy from the date the lease was terminated, with an allowance for productivity increase, and reduced it to its present value of $318,622.[10] Johnson used adjusted gross income in making his computations.

Amoco contends that the expert's projection of loss of income was speculative and completely erroneous because Arnott had a nonrenewable one-year lease which by its terms would expire February 18, 1974; further, that the proper measure of damages is the going concern value of a destroyed business. Amoco relies on *Albrecht v. Herald Co.*, 452 F.2d 124, 129–31 (8th Cir. 1971), for the proposition that there can be no recovery for loss of future profits as such; such profits may be considered only for purposes of determining lost value of business by using the capitalized profit method of valuation. The difficulty with Amoco's analysis of the *Albrecht* case is that it overlooks the fact that the district court in *Albrecht* permitted the jury to make an award based on the difference between the fair market value at the time of sale and the actual sale price received, *plus* the loss of future profits. *Albrecht v. Herald Co.*, 321 F.Supp. 99 (E.D.Mo.1970), *modified*, 452 F.2d 124 (8th Cir. 1971). In reversing the district court, this court held that it was improper to permit a plaintiff damaged by an antitrust violation to recover both the value of the business as a going concern at the time of the damage and future profits of that business after the time of the damage. Future profit potential is taken into consideration in valuing the business as a going concern.

■ In the instant case it must be acknowledged that Arnott cannot sell his business for the fair market value and also recover future profits. However, the record demonstrates that Arnott's sale of his inventory to the new lessee selected by Amoco was not a willing buyer-willing seller transaction. Under Amoco's supervision,

---

**10.** The jury's award of actual damages was $100,000.

Arnott sold his Standard Oil inventory to the new lessee, a former Standard Oil salesman from Chamberlain, South Dakota, Jay Sadler. Arnott's initial investment in February 1972 was $27,722.14, and he sold the inventory to Sadler for $30,638.05. The jury could infer from all of the circumstances that it was a forced sale with no allowance for goodwill or the value of a going business and therefore that Arnott had not received the fair market value of his business.

In *Albrecht v. Herald Co., supra*, 452 F.2d at 128–29, the court discussed numerous cases in which future profits were allowed and used as a method of calculating the damage to the value of the business involved because no other reliable method of valuing the business was presented.[11] In *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659 (5th Cir. 1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975), the court recognized that going concern value and lost future profits are viable alternative measures of antitrust damages.

> Clearly, going concern value and lost future profits are each viable alternative measures of antitrust damages. Future profits cannot be condemned as inordinately more speculative than the going concern value since the former is a crucial component of the latter. In addition going concern or goodwill value may present difficult problems of proof if the lessor of a particular station places restrictive conditions on the transfer of the lease. Finally, future profits accompanied by an award for any decline in asset values will often more fully compensate a businessman by measuring his lost earnings, not just what it is worth to someone else to reach for those earnings.

*Id.* at 663–64 (footnotes omitted). *See Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 43–44 (5th Cir.), *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972).

Amoco argues that the short-term nature of the lease limits future damages. However, this ignores the evidence from which the jury could properly infer Arnott's long-term expectations, based on future profit projections related to him prior to execution of the first lease and the custom and practice of long-term renewals known to Arnott through his prior experience with Amoco. The trial court instructed the jury that it should consider the terms and conditions of the lease and all other testimony concerning renewals. We cannot say the evidence does not support a finding that Amoco's actions indicated a long-term intention or fraudulent misrepresentation of such an intention.

There was a factual dispute concerning the duration and the reasonableness of Arnott's expectations. As stated in *Lehrman v. Gulf Oil Corp., supra*, 464 F.2d at 47:

> The duration of the period during which the plaintiff might be expected to profit will vary from case to case; it is susceptible of no precise formulation, and must be left to the processes of the jury informed by the presentation of conflicting evidence. Of course, the court might properly instruct the jury that it may consider as one factor in its deliberations the length of time which the plaintiff had been in business as of the time of the defendant's anticompetitive actions; but the youth of a business, like the precise manner of its doing-in, will never alone be enough to justify severe restrictions upon the duration of damages. The court may condition a new trial on remittitur if it feels strongly that the jury verdict is excessive. But it is arbitrary and improper to limit damages as a matter of law to the precise period of the plaintiff's business operations if the reason for that limitation is either the means used to drive the plaintiff out of business or the relatively short history of his business before its demise.

11. Cases discussed were *Lessig v. Tidewater Oil Co.*, 327 F.2d 459 (9th Cir.), *cert. denied*, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); *Osborn v. Sinclair Ref. Co.*, 324 F.2d 566 (4th Cir. 1963); *Atlas Bldg. Prod. Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950 (10th Cir. 1959), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960); and *Twentieth Century Fox-Film Corp. v. Brookside Theater Corp.*, 194 F.2d 846 (8th Cir.), *cert. denied*, 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348 (1952).

Finally, with respect to the damage issue, Amoco contends that Dr. Johnson was not qualified to testify as an expert witness. The contention is without merit and requires little comment. The thrust of Amoco's contentions is a rehash of its argument that the fact that the lease provided for a one-year term is controlling and therefore computations with respect to loss of future profits should not have been admitted. Dr. Johnson made computations with respect to Arnott's work life expectancy and loss of income and reduced the same to present value. The weight to be given thereto was a jury matter. We find no abuse of discretion by the trial court in admitting such testimony for whatever assistance it might give to the jury in weighing the evidence with respect to damages. *Cf. Holmgren v. Massey-Ferguson, Inc.,* 516 F.2d 856 (8th Cir. 1975).

## VII. Instructions.

Appellant makes the broad allegation that the court's instructions were basically erroneous and supports this allegation with a lengthy enumeration of alleged errors in the instructions themselves and in the court's failure to give proposed instructions. In effect, appellant is merely repeating the argument that the evidence offered did not create a submissible case. We deem it sufficient to say that we have reviewed the instructions in detail and, when considered as a whole, we are satisfied that the issues were properly submitted to the jury.

## VIII. Verdict Ambiguity.

The jury returned a general verdict in favor of Arnott and against Amoco in the sum of $100,000 actual or compensatory damages and punitive and exemplary damages of $25,000. The jury further answered special interrogatories with respect to liability only against Amoco:

Did you find Defendant American Oil Company liable based on:

|   |   |   | (yes) or (no) |
|---|---|---|---|
| a. | False and fraudulent representations | ANSWER | Yes |
| b. | Breach of fiduciary duty | ANSWER | Yes |
| c. | Violation of anti-trust laws | ANSWER | Yes |
| d. | Atty's. fees in State Court Action | ANSWER | Yes [12] |

The district court trebled the $100,000 actual or compensatory damages in view of the jury's finding of liability under the antitrust laws.

Amoco contends that the verdict is ambiguous and that the court must speculate as to its meaning; there is no way of determining what portion of the lump sum damages was allotted to each item; it cannot be assumed that $100,000 was properly attributable to the antitrust claim; the court erred in trebling the award; and therefore a new trial must be ordered. *See Rea v. Ford Motor Co.,* 497 F.2d 577, 579 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Furthermore, the court awarded treble damages in the amount of $300,000 and allowed the punitive damages of $25,000 to stand, thus making a total award of $325,000. Punitive and treble damages cannot both be awarded for violation of the antitrust laws. *Hansen Packing Co. v. Armour Co.,* 16 F.Supp. 784, 788 (S.D.N.Y. 1936).

Arnott argues that the jury found for him on all three counts [13] submitted to it and that the sole evidence of damages offered was the same on all three counts—loss of future profits. Arnott also points out that prior to making the record on instructions, Amoco asked for interrogatories on the issues of liability, which were granted, and that the trial court inquired of Amoco counsel whether they cared to propose any interrogatories on damages, which they did not. We cannot consider the latter argument because the inquiry and response were not made on the record. However, counsel for Amoco does concede, and the record indicates, that no objection was made by Amoco to the verdict form except the general objection that there were no

12. Attorney fees in state court action were conceded not to be in dispute, so there will be no further discussion thereof. *See* n. 3 *supra.*

13. *See* n. 12 *supra.*

submissible jury issues. Under the circumstances the failure of Amoco to request any instructions or special interrogatories on damages or to make objection to the general verdict form results in a waiver of such objections on appeal. Fed.R.Civ.P. 51; *Missouri Pac. R.R. v. Star City Gravel,* 592 F.2d 455 (8th Cir. 1979); *see Richardson v. Communications Workers,* 486 F.2d 801, 804–05 (8th Cir. 1973). Amoco also failed to object or seek clarification when the verdicts were rendered [14] and therefore waived objection to the form of the verdict. *See Tennessee Consol. Coal Co. v. United Mine Workers,* 416 F.2d 1192, 1200–1201 (6th Cir. 1969), *cert. denied,* 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970).

It is our task to determine if it was plain error for the court not to instruct the jury with respect to awarding damages separately as to each count and not to submit interrogatories or verdict forms as to the amount of damages found on each count. Any plain error exception to Fed.R.Civ.P. 51 is " 'confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings.' " 2 Barron and Holtzoff, Federal Practice and Procedure 475 (1961 ed.), *quoted in Horace v. St. Louis Southwestern R.R.,* 489 F.2d 632, 634 (8th Cir. 1974).

▮ We are persuaded that the failure of the trial court to submit verdict forms or interrogatories on each theory of recovery prevented it from trebling the $100,000 actual damages awarded in the general verdict. It would be purely speculative to assume that the entire general verdict of $100,000 was awarded as damages resulting from violation of the antitrust laws. We are, however, satisfied that the evidence amply supports an award of $100,000 actual and compensatory damages on any of the three counts of (1) false and fraudulent representations, (2) breach of fiduciary duty, and (3) violation of the antitrust laws.[15] We are also persuaded that the jury's award to Arnott and against Amoco of punitive and exemplary damages in the sum of $25,000 is supported by the record.

Upon condition that appellee George Arnott file a remittitur within thirty days hereof of that portion of the judgment in excess of $125,000, plus interest and costs from the date judgment was entered herein, the judgment is affirmed. Otherwise this cause is remanded for a new trial.

Affirmed on condition that a remittitur be filed.

BRIGHT, Circuit Judge, concurring and dissenting:

I concur in the result reached by the majority, but only because I believe that substantial evidence in the record supports the jury verdict on the claim of fraud and because I believe that the payment of the suggested remittitur would constitute a reasonable resolution of this litigation.[1] I do not believe that, as a matter of law, a fiduciary relationship existed between the parties in this case, nor do I believe that the evidence demonstrates a violation of the antitrust laws. Because the majority's reasoning on those issues appears to me to be in error and because this case may be retried, I set forth my views in dissent.

---

14. Counsel for Amoco was present when the jury returned its verdicts and in fact requested that each juror be individually polled on each and every interrogatory and verdict.

15. Although not raised by the parties, we suggest that if a new trial occurs, the better practice is to omit from the jury instructions any reference to the trebling of damages in connection with the recovery of damages under the antitrust laws. *See* Devitt & Blackmar, 3 Federal Practice and Instructions § 90.39 (3d ed. 1977).

1. The appellant's objection that the proof of damages offered by the appellee was speculative has merit, but it does not appear that appellant objected to some of the evidence now questioned. Moreover, the jury quite obviously did not accept the calculations of plaintiff's expert. Under these circumstances, I agree with the majority that the jury award may stand if the appellee accepts the remittitur.

## I. The Relationship Between the Parties.

The district court twice instructed the jury that, as a matter of law, a fiduciary relationship existed between Arnott and Amoco, requiring Amoco to act for itself only with utmost good faith and the full knowledge and consent of Arnott. These strictures, though appropriate in the case of a trustee, should not be applied to a commercial lessor. Rather, the lessor should be held to the rules governing contracts in general. It is true that a franchisor might have other duties. But only if the evidence shows a relationship between lessor and lessee extending significantly into other areas is it necessary or desirable to characterize their arrangement as a franchise. Even then one must determine which of the full gamut of fiduciary responsibilities should be required of the franchisor. *See Eaton, Yale & Towne, Inc. v. Sherman Industrial Equip. Co.*, 316 F.Supp. 435, 445 (E.D. Mo. 1970). In my view both the district court and the majority erred in deciding this matter; in fact, South Dakota law does not justify the conclusion they reach.

The majority acknowledges (*ante*, at 883 n. 8) that Judge Nichol's instruction on fiduciary duties was based on a New York case that was later reversed. The majority maintains, however, that the instruction properly reflected South Dakota law because of the subsequent enactment there of a comprehensive franchise statute, S.D. Compiled Laws Ann. ch. 37–5A. The majority quotes Judge Nichol as expressly construing that franchise statute as a codification of the common law of South Dakota. *Ante*, at 883–884. I do not so read the record.[2]

The South Dakota franchise law contains detailed registration and public disclosure provisions akin to those found in the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (1976). This scheme of franchise regulation doubtless represents a substantial departure from the common law of South Dakota. But even if the franchise statute reflected existing common law standards applicable to the lease challenged here, the district court's instructions would remain unjustified. The statute merely enjoins unfair or inequitable practices. S.D. Compiled Laws Ann. §§ 37–5A–51 and 37–5A–66(7). It does not establish a fiduciary relationship between franchisor and franchisee or impose a standard of utmost good faith.

The cases cited by the majority go no further than the South Dakota statute. *Shell Oil Co. v. Marinello*, 120 N.J.Super. 357, 294 A.2d 253 (1972), aff'd, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 307, 39 L.Ed.2d 475 (1974), nowhere mentions the concept of a fiduciary relationship. Rather, the court there simply granted dealer Marinello's prayer for contract reformation by inferring a contractual term that Shell could refuse to renew his franchise (comprising both a lease and a multifaceted dealer agreement) only for good cause. *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736, 743 (1978), is to the same effect. Not only do these cases fail to state a general principle of fiduciary duty, but they are also readily distinguishable on their facts from the case at hand. Here Arnott breached the terms of his lease agreement by failing to stay open twenty-four hours a day; in terminating his lease, Amoco was proceeding under a clause permitting termination for cause.[3]

2. In the passage relied on by the majority, plaintiff's counsel was attempting to explain the New Jersey Superior Court's interpretation of that state's franchise statute in *Shell Oil Co. v. Marinello*, 120 N.J.Super. 357, 294 A.2d 253 (1972), aff'd, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 307, 39 L.Ed.2d 475 (1974). Judge Nichol interrupted to observe, "In other words, they were codifying the common law." Plaintiff's counsel replied, "That's exactly right." Judge Nichol then said, "Just as *maybe* South Dakota did when it adopted the Franchise Act, was codify-

ing what was really the law in South Dakota anyway." (Emphasis added.) Plaintiff's counsel responded, "That's exactly what the New Jersey Court said."

3. The evident purpose of the statutory and common law termination requirements * * * is the protection of franchisees who have conscientiously striven to carry out their obligations under the franchise agreement. They were not intended to prevent the severance of those who deliberately disregard reasonable requirements contained in their contract

The parties in this case entered into a business relationship, not a fiduciary relationship. Each party served the interests of the other, but each also quite properly sought its own interests. The district court was unwilling to find the terms of their agreement unconscionable. *Cf. Shell Oil Co. v. Marinello, supra,* 307 A.2d at 602–03 (striking the disputed termination provision as unconscionable and contrary to public policy). I think that it was unnecessary to go beyond this conclusion, and I believe the court committed error when, on the facts of this case, it instructed the jury that a strict fiduciary relationship existed between Arnott and Amoco.[4]

## II. *The Antitrust Claim.*

The majority concludes that Amoco combined to fix vertical prices, a *per se* violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1976).[5] Having reviewed the record, I believe that there is insufficient evidence to support this conclusion. Specifically, I find no proof of a combination or

conspiracy in this case; the contract between Arnott and Amoco was admittedly innocuous. My reading of the record is supported by Judge Nichol's observation at the close of plaintiff's case: "I don't see any evidence of conspiracy or combination in this case * * * [.]" Unlike Judge Nichol, I believe this implicit finding of unilateral activity vitiates Arnott's antitrust claim. *See Quality Mercury, Inc. v. Ford Motor Co.,* 542 F.2d 466, 469 (8th Cir. 1976), *cert. denied,* 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 466 (1977).

The record in this case reflects that Arnott usually posted his retail gasoline prices a penny or two above those suggested by Amoco. Such deviations led to "coffee" with Amoco representatives, but no change. In the only direct incident regarding prices recalled by Arnott or his employees, Dick Lucas, field sales manager for Amoco, refused one day to purchase gas from Arnott because he thought it was too expensive. Arnott let his prices stand.[6]

with the franchisor. [*Amerada Hess Corp. v. Quinn,* 143 N.J.Super. 237, 362 A.2d 1258, 1267 (1976).]

**4.** This error was not made harmless by the context in which it occurred, as the majority suggests. *Ante,* at 884. The disputed instruction was repeated by the court without benefit of context when, after two hours of deliberations, the jury returned with the question, "Define fiduciary duty."

**5.** 15 U.S.C. § 1 provides in pertinent part: "Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States, * * * is hereby declared to be illegal[.]"

**6.** If I were writing on a clean slate with only the rule of reason for guidance, *see Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), I would be hard pressed to find unlawful an actual combination that succeeded in keeping down Arnott's prices. Arnott was, after all, exploiting the modicum of monopoly pricing power that he enjoyed by virtue of his location on an interstate highway.

Arnott testified that, in effect, many of his customers were ignorant of the prices charged by his off-highway competitors. He therefore found it advantageous to raise his prices; demand for his gas was not greatly reduced. Amoco, on the other hand, had a direct interest

in maintaining the volume of Arnott's sales, in part because his lease payments were based solely on fuel gallonage. *See Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 56 n. 24, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Amoco also had an important interest in the pricing reputation of its stations generally. Success in restraining Arnott's prices would have advanced the interests of both Amoco and Arnott's customers, at the same time replicating (with respect to Arnott) the consequences of a fully competitive retail gasoline market. *See Albrecht v. Herald Co.,* 390 U.S. 145, 169, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (Stewart, J., dissenting).

The Supreme Court has, however, displaced the rule of reason in cases such as this by making agreements or combinations to fix maximum prices *per se* illegal. *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Albrecht v. Herald Co., supra,* 390 U.S. at 151, 88 S.Ct. 869. *But cf. Continental T. V., Inc. v. GTE Sylvania Inc., supra* (restoring the rule of reason in cases addressing the legality of vertical nonprice restrictions). Notwithstanding the caveat in *Continental T. V.* distinguishing price from nonprice restrictions, 433 U.S. at 51 n. 18, 97 S.Ct. 2549, the Court's reasoning in that case suggests that the *per se* approach adopted in *Albrecht* may not survive reexamination. *See Continental T. V., Inc. v. GTE Sylvania Inc., supra,* 433 U.S. at 69–70, 97 S.Ct. 2549 (White,

The majority suggests two theories under which the jury could find a combination or conspiracy in this case: first, that Amoco and Arnott combined when the latter unwillingly complied with Amoco's "pricing directives"; and second, that Amoco combined with other dealers who "acquiesced in the enforced pricing policy." *Ante,* at 884. Both of these theories are derived from dicta in *Albrecht v. Herald Co.,* 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Neither one is applicable here.

First, the evidence provides no support for the notion that Arnott complied with Amoco's "pricing directives." "Directives" cannot mean merely Amoco's suggested prices: such suggestions, standing alone, were clearly permissible. *Susser v. Carvel Corporation,* 332 F.2d 505, 510 (2d Cir.), *cert. granted,* 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), *cert. dismissed as improvidently granted,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). The majority must be referring more particularly to the conversations over coffee that Arnott had with Amoco representatives when he deviated from the suggested prices. But there is no evidence that Arnott changed his prices as a result of these conversations, or that he thereafter hewed more closely to Amoco's suggested prices. The cited incident with Dick Lucas likewise resulted in no change; Arnott continued to price independently (*i. e.,* generally higher than Amoco's suggested prices) throughout the period of his lease. Hence, in this case no combination existed and no actual fixing of prices occurred. *Cf. Quinn v. Mobil Oil Company,* 375 F.2d 273 (1st Cir.), *cert. dismissed,* 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967) (affirming dismissal of an antitrust complaint on similar facts).

The panel's second theory is also inapplicable to the facts of this case. Having reviewed the record, I find no substantial evidence of a combination between Amoco and its other dealers. The record simply does not support the majority's characterization of the dealers' behavior as "acquies[ence] in [an] enforced pricing policy." *Ante,* at 885. In contrast to the fragments of Mrs. Pascoe's testimony quoted by the majority, *ante,* at 885, nine witnesses who were past or present Amoco lessees (including Greg White) testified that retail gas prices were only suggested by Amoco, that the dealers possessed final authority to set prices, and that this authority was frequently exercised independently. Moreover, not one testified that his lease had been threatened or terminated in retaliation for independence in pricing. *Cf. Umphres v. Shell Oil Company,* 512 F.2d 420, 422 (5th Cir.), *cert. denied,* 423 U.S. 929, 96 S.Ct. 278, 46 L.Ed.2d 257 (1975) (holding comparable evidence of vertical price fixing to be clearly insubstantial).

Even if a combination with other dealers were shown to exist, I would be loath to hold that it satisfies the statutory requirement of a "combination * * * in restraint of trade." In fact, any such combination would be wholly irrelevant to the restraint of trade alleged here. *See Albrecht v. Herald Co., supra,* 390 U.S. at 161, 88 S.Ct. 869 (Harlan, J., dissenting). The other dealers in the Sioux Falls area had little or no interest in Arnott's affairs. To the extent that they had an interest, it was not that of Amoco: in all likelihood, the other dealers preferred that Arnott keep his price higher than that suggested, as such a policy might well bring them more customers. *Cf. Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068 (3d Cir. 1978) (finding similarly collateral dealings involving the defendant to be insufficient evidence of concerted activity).

Under either of the majority's theories, Arnott failed to establish the "contract, combination or conspiracy" essential to his Sherman Act claim. Hence, the cases the majority relies upon in finding an antitrust

J., concurring); Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision,* 45 U.Chic.L.Rev. 1, 12 (1977); Koches, *Developments in the Law of Vertical Nonprice Restrictions: A Welcome Re-* turn to the Rule of Reason, 33 U.Miami L.Rev. 247, 266–68 (1978); Pitofsky, *The Sylvania Case: Antitrust Analysis of Non-Price Vertical Restrictions,* 78 Colum.L.Rev. 1, 16 n. 59 (1978).

violation are not controlling here. In *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), plaintiffs challenged retail service station leases that were tied to "consignment" agreements expressly empowering the supplier to set the selling price. The presence of this price-fixing term, the Court found, distinguished *Simpson* from *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); its enforcement made the "consignment" agreements contracts in restraint of trade. *Simpson v. Union Oil Co., supra,* 377 U.S. at 24, 84 S.Ct. 1051. In the case at hand there was no such price-fixing term; indeed, in the only written agreement concerning pricing, Arnott was promised "an absolute right to set [his] own resale prices * * * *." [7]

*United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), is also inapposite. In that case a drug manufacturer was found to have combined not only with acquiescing retailers but also with its wholesalers in order to terminate those retailers that cut prices. Similarly, in *Albrecht v. Herald Co., supra,* 390 U.S. at 149–150, 88 S.Ct. 869, the defendant newspaper publisher was found to have combined with two other persons, including a rival carrier, to force plaintiff to charge only the advertised retail price for his newspapers. In the case at hand, by contrast, Amoco acted unilaterally in terminating Arnott's lease. The other Amoco dealers cannot be said to stand in the position of the wholesalers in *Parke, Davis* or the rival carrier in *Albrecht* because they had no power over Arnott. Amoco therefore could not and did not employ the other dealers as a weapon in its dispute with Arnott.

In sum, I believe that the majority's treatment of fiduciary duties and the antitrust claims in this case is in error. I fear that their approach will also have unfortunate consequences in practice. Arnott clearly breached the express terms of his lease agreement. To limit unduly Amoco's power of termination in circumstances such as these (putting aside the issue of fraud), and to uphold a dubious antitrust claim by the dissatisfied lessee, invites wholesale suppliers to replace their lessees and distributors with company employees whose freedom of action will be considerably more restricted. *See Continental T. V., Inc. v. GTE Sylvania Inc., supra,* 433 U.S. at 57 n. 26, 97 S.Ct. 2549.[8] That is to say, the approach taken by the majority encourages increased concentration in the retail market for gasoline and related products. I consider this to be unwarranted and unfortunate.

---

**7.** To be sure, Arnott alleged that Amoco breached this promise. But the breach of a contract term does not transform the contract, so that what it once promised, it now forbids. Nor can it be argued that price fixing was a term in an implied contract that replaced the fraudulently induced lease agreement; as noted above, Arnott never agreed to such a term. If Amoco sought to fix Arnott's prices, it did so in spite of, not in furtherance of, the terms of

their agreement. Theirs was simply not a contract in restraint of trade.

**8.** Examples of this process may be found in *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977); *Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); and *McGuire v. Times Mirror Co.*, 405 F.Supp. 57 (C.D.Cal.1975).